**Gene F. LENZ, Plaintiff–Appellee and Cross–Appellant,**

v.

**Roger W. DEWEY and Sue E. Mecca, Defendants–Appellants and Cross–Appellees.**

Nos. 94–8013, 94–8019.

United States Court of Appeals, Tenth Circuit.

Aug. 24, 1995.

Eric M. Alden, Wheatland, WY, for plaintiff-appellee and cross-appellant.

Bruce A. Salzburg, Cheyenne, WY, for defendants-appellants and cross-appellees.

Before KELLY, SETH and HENRY, Circuit Judges.

PAUL KELLY, Jr., Circuit Judge.

Defendants-appellants and cross-appellees Roger W. Dewey and Sue E. Mecca appeal from the entry of a $60,000 judgment against them in Plaintiff-appellee and cross-appellant Gene F. Lenz's civil action for deprivation of employment without due process of law under 42 U.S.C. § 1983. They contend that the district court erred by denying qualified immunity, denying their Rule 50(a) motion for judgment as a matter of law on the grounds that the Plaintiff had no protected property interest in his employment at the Bank, contending that even if he did, Defendants' conduct did not deprive Mr. Lenz of that interest, and giving the jury an erroneous instruc-

tion on nominal damages. Mr. Lenz cross appeals arguing that the district court erred in holding that he had a property interest only in his position as an officer and director of the Bank's holding company and not in his terminable at will position as the Bank's director and president. We have jurisdiction under 28 U.S.C. § 1291. We reverse the district court's denial of Defendants' motion for qualified immunity.

## Background

From 1986 to 1991, Mr. Lenz served as president and chief executive officer of the Lusk State Bank ("Bank") as well as director and shareholder of Banker's Capital Corporation, the Bank's holding company. The Bank was chartered by the State of Wyoming and therefore subject to regulation by the state banking commissioner (formerly the State Examiner). It was also regulated by the Federal Reserve Board as a member bank.

During Mr. Lenz's tenure, the Bank experienced innumerable regulatory problems. In the 1980's, the Bank had over one thousand citations for state and federal banking violations, the worst record in the Kansas City Federal Reserve district. On January 17, 1990, the Kansas City Federal Reserve Bank notified the Bank's board of directors of its intent to initiate formal supervisory action over the Bank due to its continued legal violations, also problems related to the Bank's securities trading, the mismatch between its interest rate sensitive liabilities and assets, and its excessive loan documentation problems.

On June 1, 1990, the Federal Reserve and the Bank's board entered into a Written Agreement requiring the Bank to take a series of remedial actions. On October 31, 1990, both state and federal regulators examined the Bank's compliance with the Written Agreement and concluded that it was deficient. In the months that followed, the Bank received a number of warnings stating that failure to comply with the Written Agreement might subject directors to the imposition of civil monetary penalties. On April 29, 1991, the state and federal regulators held a meeting with the Bank's board of directors.

Again, the regulators warned that the Bank was not in compliance with the Written Agreement, each board member was potentially liable for up to $370,000 under 12 U.S.C. § 1818(i)(2), and they did not find Mr. Lenz capable of complying with the Written Agreement.

At this meeting, Roger W. Dewey, director of the Wyoming Department of Audit and acting State Examiner, and Sue E. Mecca, then manager of the Banking Division of the Wyoming Department of Audit, presented a proposed Letter of Understanding ("Letter") to the board. Essentially, the Letter tracked the requirements of the Written Agreement and imposed additional requirements, making it clear that any significant noncompliance would result in an order to remove Mr. Lenz from office under Wyo.Stat. § 13–3–104(a) (1977).

Thereafter, the board members convened and concluded that if they did not seek Mr. Lenz's removal, they could be liable for the monetary penalties. Mr. Dewey confirmed that the Letter need not be implemented if the Bank terminated its relationship with Mr. Lenz. The board advised Mr. Lenz that they would purchase his bank stock if he resigned, but if he refused to resign, it would fire him without purchasing the stock. Mr. Lenz and the board entered negotiations that lasted through May and most of June. On June 21, 1991, Mr. Lenz resigned from his "terminable at will" position as president and director of the Bank, in accordance with a Severance of Connection/Stock Purchase Agreement. In exchange for his resignation, Mr. Lenz received $230,000 in cash and notes for his stock in Banker's Capital Corporation, plus additional consideration in the form of severance pay and personal property.

The issues before us on appeal stem from the § 1983 action Mr. Lenz brought against Mr. Dewey and Ms. Mecca. Mr. Lenz alleged that the Defendants deprived him of employment without due process of law and adversely affected his ability to obtain suitable employment in the banking industry in the future. The essence of his civil right claim was that Mr. Dewey and Ms. Mecca threatened each of the Bank's board of directors with civil monetary penalties and left

them no choice but to request Mr. Lenz's resignation. According to Mr. Lenz, Mr. Dewey and Ms. Mecca effectively removed him from employment without affording him a hearing, thereby violating due process under the United States Constitution, the Wyoming Constitution, and Wyo.Stat. § 13–3–104(d).

Before trial, Defendants moved for summary judgment on the affirmative defense of qualified immunity. The district court denied the motion, and the parties proceeded to trial before an advisory jury. The jury found that Mr. Dewey and Ms. Mecca had deprived Mr. Lenz of his property interest as an officer and director of the Bank's holding company without affording him due process of law and awarded him $60,000. The district court incorporated this decision in its judgment.

### Discussion

■ Mr. Dewey and Ms. Mecca contend that the district court erred in holding that they were not shielded by qualified immunity on summary judgment. Because the court's denial of their qualified immunity defense turned solely on issues of law, error has been preserved for appeal. *Wilson v. Union Pac. R.R. Co.*, 56 F.3d 1226, 1229 (10th Cir.1995) (summary judgment on legal issues may be appealed despite lack of Fed.R.Civ.P. 50(a) motion); *Ruyle v. Continental Oil Co.*, 44 F.3d 837, 841–42 (10th Cir.1994) (same), *cert. denied*, —— U.S. ——, 116 S.Ct. 272, —— L.Ed.2d —— (1995). We review "the presence or absence of qualified immunity ... de novo." *Langley v. Adams County*, 987 F.2d 1473, 1476 (10th Cir.1993).

■ Once a defendant asserts qualified immunity, the plaintiff bears the burden of proving that the defendants violated a law that was clearly established. *Patrick v. Miller*, 953 F.2d 1240, 1243 (10th Cir.1992). The plaintiff must make a particularized showing, demonstrating that the contours of the violated right were so established that "a reasonable official would understand that what he [wa]s doing violate[d] that right," *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), or that the

official did not act in good faith. *See Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2736–37, 73 L.Ed.2d 396 (1982).

■ The record reveals that Mr. Dewey and Ms. Mecca acted within the scope of their employment as state regulators and in accordance with Wyo.Stat. 13–1–603 (1977). There is no evidence that the Defendants violated any law, much less any evidence that they knew or should have known that their warnings to the board triggered Mr. Lenz's right to due process. Furthermore, there is no evidence that they did not act in good faith. Hence, qualified immunity should have protected them from liability. *See Lassiter v. Alabama A & M Univ. Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc).

■ The district court found, however, that the Defendants were not entitled to qualified immunity because they were on notice of Mr. Lenz's right to a hearing under Wyo.Stat. § 13–3–104(d). We conclude that the district court erred by denying Defendants' qualified immunity defense based on this statute. Section 13–3–104(d) explicitly provides the opportunity for a hearing in conjunction with an order that is issued pursuant to the statute. Defendants never issued such an order, and therefore the hearing requirement under Wyo.Stat. 13–3–104(d) never came into play.

All that Mr. Dewey and Ms. Mecca did was to inform the board of the Bank's legal violations, the need for the Bank to comply with the Written Agreement, members' potential liability for monetary penalties, and the possibility of Mr. Lenz's removal if noncompliance continued. It was entirely the board's prerogative to stand behind its president. Had it done so and had an order subsequently been issued pursuant to statute, a hearing could have been requested and would have been required. However, those are not the facts of this case.

■ Mr. Lenz also asserts that he was deprived of a protected property interest in his employment in violation of state and federal constitutional rights to due process. In the employment context, "the Supreme Court has defined a property interest as a legitimate expectation in continued employment." *Russillo v. Scarborough,* 935 F.2d 1167, 1170 (10th Cir.1991) (citing *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). The district court determined that Mr. Lenz could not assert a protected property interest in his employment as president and CEO of the Bank because it was terminable at will. We agree.

■ We define property interests according to "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. "Ordinarily an employee's at-will status forecloses a property interest claim because the employee has no legitimate expectation of future employment." *Russillo,* 935 F.2d at 1170. There is no evidence of any independent source—either state law, see *Hatfield v. Converse County,* 52 F.3d 858, 863 (10th Cir.1995), or an internal Bank policy—that endows Mr. Lenz with a protected property interest in his at-will employment.

■ The district court held, on the other hand, that Mr. Lenz did have a protected property interest in his stock ownership and directorship of the Bank's holding company. While this may be true, see *F.D.I.C. v. Mallen,* 486 U.S. 230, 240, 108 S.Ct. 1780, 1787, 100 L.Ed.2d 265 (1988), Mr. Lenz has not established that the Defendants deprived him of these rights. There is no suggestion in the briefs or the record that Mr. Lenz's stock ownership or holding company directorship was the subject of any discussion by the Defendants with anyone. It was the board, not the Defendants, who gave Mr. Lenz the choice between resignation from the holding company board with payment of his stock or termination without payment. Even if we impute the board's actions to Mr. Dewey and Ms. Mecca, we find that by voluntarily resigning from the holding company board, Mr. Lenz relinquished any property interest he might have had and was not deprived of due process by the Defendants. *Parker v. Board of Regents,* 981 F.2d 1159, 1162 (10th Cir. 1992).

██ We have held that offering an employee a choice between resignation and termination does not violate an employee's due process of law, as long as the resignation is "voluntary." *Id.* In order to assess the voluntariness of an employee's resignation, we must consider (1) whether the employee was given an alternative to resignation, (2) whether the employee understood the nature of the choice he was given, (3) whether the employee was given a reasonable time in which to choose, and (4) whether the employee could select the effective date of resignation. *Id.* Mr. Lenz was given a choice of resignation with stock payment or without, there is no evidence that he did not comprehend his choice, the board and Mr. Lenz negotiated the terms of his Severance Agreement for a month-and-a-half, and he chose to resign on June 21, 1991. We therefore conclude that Mr. Lenz resigned voluntarily. Consequently, qualified immunity acts to bar this action against the Defendants, *id.*, and the other issues the parties raise regarding the trial are no longer relevant.

REVERSED.

SETH, Circuit Judge, dissenting.

I must respectfully dissent from the majority opinion herein.

In my view, a description of one meeting between the Wyoming and federal regulators with the directors of the Lusk State Bank, together with a little background, demonstrates why I cannot agree with the majority.

The Federal Reserve Bank of Kansas City, by reason of its examinations of the Lusk State Bank, and the problems therein revealed, required a "Written Agreement" between the Federal Reserve and the Bank to cover specific problems, with corrective action required. The opinion of the federal regulators was that the Bank management could not correct the errors, the many violations of regulations. The Agreement dated June 1, 1990 was signed for the Bank.

State regulators also involved in examinations were concerned over violations of regulations, but no serious concern was expressed over the immediate financial condition of the Bank. The basic problem to the state regulators apparently was that the directors and officers, especially the Plaintiff, were not responding to the results of examinations of the Bank, the specific errors, and also there were no adequate policies as to important aspects of the operations. Finally, the regulators, both the Federal Reserve Bank of Kansas City and the Wyoming regulators, the Defendants herein, decided to hold a meeting on April 29 with the directors of the Lusk State Bank to be held not in Lusk, but in Cheyenne.

### The Meeting of April 29

As mentioned, the meeting was arranged by the regulators, and *they decided who should attend.* Those attending were Mr. McBride of the Kansas City Federal Reserve and Mr. Yorke from the Denver Federal Reserve. A lady from the Kansas City Federal Reserve made a detailed presentation of the defects shown in the Bank's last examinations. The Defendants from the Wyoming regulatory agency were, of course, there. The Lusk State Bank directors were there, with one absent; the Plaintiff was present as president and a director of the Bank; as were the Bank attorney and the Bank CPA. All had been summoned from Lusk to Cheyenne.

There were introduced, without any explanation as to why they were at the meeting, two officers of the Wyoming Department of Criminal Investigation. There was, however, during the meeting a discussion of criminal penalties that the directors of the Bank might be liable for.

Defendant Mecca, in her presentation at the meeting, advised the directors that each one *could* be liable for a $370,000 civil penalty for bank failure in the past to conform to regulations. For Defendant Mecca's testimony the Defendants sought out a single past violation of a regulation which *could* cause the federal authorities to assess a civil money penalty at the largest daily rate. This she quantified in her presentation at the meeting. This was the $370,000 against each director. Defendant Mecca testified at trial that there was no authority under Wyoming law to assess such a penalty. Thus she was using a penalty which could only be assessed

by the federal regulators. There was no indication in the record that any such action was in any way contemplated by the federal regulators although they had some new authority to do so. Mrs. Mecca also mentioned the possible criminal penalties in her statements at the meeting. The officers of the Wyoming Department of Criminal Investigation were present, as mentioned.

The Plaintiff as Bank president was given fifteen minutes to respond to the extended federal and state regulators' presentations. After the initial meeting the regulators had another but separate meeting with the directors; however, Plaintiff was not permitted to attend although he was a Bank director.

The meeting itself included what was apparently a good presentation of the Bank's problems by the lady from the Kansas City Federal Reserve, and many problems were so described. However, thereafter very serious implications of the actions by the state regulators, the Defendants, are apparent. These were:

Their "threat," and it must be so described, of the possible $370,000.00 civil penalty for one violation in the past for each director was obviously intended to accomplish the removal by the Board of Plaintiff. It had been mentioned before several times that there were possible civil money penalties, but this was the first time they had been quantified for one violation and the impact had to be significant at the very least.

Also, to bring up the matter of general criminal penalties at that time was another threat orchestrated by having then present the two officers of the Wyoming Department of Criminal Investigation.

Another significant event at "the meeting" was the presentation of and request by the Defendants that all the directors sign, in due course, a document of four or five pages titled "Letter of Understanding" between the Wyoming Division of Banking and the Lusk State Bank. This contained detailed requirements:

The first requirement was that if the "Bank" did not comply with Sections 2 through 11, and 13 through 16a, of the Letter, "as determined by the Examiner,

will result in the *board of directors' removal* of President, Director and CEO Gene F. Lenz from office and his membership on the Bank's board of directors." (Emphasis added.)

The sections of the Letter referred to above contained general basic plans and policy matters as well as specific requirements. There were two or three references to civil money penalties. One states that violations of written agreements can lead to federal civil penalties. Others contained specific restrictions/changes in lending practices, depreciation and renewal of loans. The Bank had 60 days to comply. Compliance was to be monitored solely by the State Examiner.

The Letter, presumably, was to bring about important, basic and thorough changes in the Bank's method of doing business. It was to be signed by all directors. Noncompliance as to several provisions would require the directors to fire the Plaintiff, as mentioned.

This discussion of "the Letter" needed some detail as it must be put in the context of the other "events" at the meeting. The Letter was very important to the Wyoming regulators. They apparently had consulted with the Wyoming Attorney General. It was complete and carefully prepared presumably to bring the Bank into "compliance." The Defendants so indicated. This Letter submitted at the meeting built on and was timed with the "threats" of dollars as well as the mention of criminal consequences with the attendance of the two officers of the Wyoming Department of Criminal Investigation at the meeting.

However, a great and sudden change came about as to the Letter and the significance of the meeting. This was demonstrated shortly after the meeting by the statement of the Defendants that the Board really did not have to sign the Letter at all if it fired the Plaintiff. And for this surprising and fundamental change all it took was a phone call to Defendant Mecca. Thus the recited purpose and the detailed provisions of the Letter were really of no significance and all disappeared. The only purpose of it all was to have the Board fire Plaintiff. This purpose was so accomplished in an improper way, and, in my view, in violation of Plaintiff's

constitutional rights. The state statutory procedure is clear for authorized removal of a bank officer. It must be mentioned that this was the "spring of 1991." The Defendants in their Answer to Plaintiff's Complaint herein had stated:

"13. Answering ¶ 13, Defendants Dewey and Mecca admit that in the spring of 1991, the Defendants, based upon numerous statutory violations, sought the removal of the plaintiff as an officer and director of the Lusk State Bank."

The requirements of Wyoming Statute Section 13–3–104 were avoided.

### Other Issues

The above description of the Cheyenne meeting of April 29, and the Letter with its demise, is sufficient to decide several basic issues. Thus it demonstrates that the Defendants were not entitled to qualified immunity. Their actions went far beyond Wyoming Statute Section 13–3–104 relating to the removal of bank officers. The Defendants acknowledged they were familiar with the statute.

The same description also constitutes an adequate demonstration of third party interference by state officials with Plaintiff's employment with the Bank. If it was "at will" between the individual and his employer, as the trial court stated, it is necessary to consider and decide whether the doctrine of third party interference should be applied as the doctrine is, of course, well established. *See F.D.I.C. v. Mallen*, 486 U.S. 230, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988); *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); *Truax v. Raich*, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915); *DiMartini v. Ferrin*, 889 F.2d 922 (9th Cir.); *Chernin v. Lyng*, 874 F.2d 501 (8th Cir.1989). The jury found there was "interference" under state law with the employment contract, but found state law immunity. Thus the trial court was in error in an application of "at will" employment doctrine as determinative in these circumstances.

The Plaintiff had a protected property interest in employment in his position as the Bank president. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The trial court concluded that Plaintiff had a protected property interest as a director and this is what was demonstrated. The trial court did not hold that the protected property interest was in the holding company.

Our decision cannot be influenced by the results of examinations by the state or federal regulators. We are not concerned whether there was cause for removal of Plaintiff as President or not. Instead, the matters before us concern the methods used and acts by the Defendant state regulators in bringing about Plaintiff's removal.

Again, I cannot agree with the majority opinion, and would reverse on the basic issues discussed above and remand for a new trial within the provision of this dissent.