**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 24 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JOHN LIGHTON,

      Plaintiff-Appellant,

v.

UNIVERSITY OF UTAH; KAREN
McCREARY; JAMES EHLERINGER,

      Defendants-Appellees.

No. 99-4070

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 96-CV-606)**

Robert H. Wilde, Midvale, Utah, for Plaintiff-Appellant.

Brent A. Burnett (Jan Graham, Attorney General, with him on the brief), Assistant
Attorney General, Salt Lake City, Utah, for Defendants-Appellees.

Before **TACHA, BALDOCK** and **BRORBY**, Circuit Judges.

**BRORBY**, Circuit Judge.

      This appeal arises from a 42 U.S.C. § 1983 action for damages brought by

Appellant John Lighton, a former assistant professor at the University of Utah

(University), against Appellees James Ehleringer and Karen McCreary – two University officials in their official and individual capacities. At issue is whether the district court properly granted summary judgment to Dr. Ehleringer and Ms. McCreary on Dr. Lighton's § 1983 complaint, which alleges they constructively terminated him without due process of law following sexual harassment and retaliation charges filed against him by a subordinate. We exercise our jurisdiction under 28 U.S.C. § 1291 and affirm.

FACTUAL BACKGROUND

This case involves numerous undisputed, material facts relied on by the district court in making its summary judgment decision. We begin by noting Dr. Lighton worked at the University as a tenure-track assistant professor in the biology department. During his employment with the University, he had an affair with Dr. Fielden-Rechav ("Dr. Fielden"), a subordinate female researcher from South Africa who was visiting his laboratory for two to three months to learn advanced respirometry techniques for insects. During this period, they submitted a written grant application to the National Institute of Health seeking funding for a research project to study ticks. In June 1994, the National Institute of Health granted the application. As a result, Dr. Lighton furnished Dr. Fielden a three-year contract to work with him under the grant. Regardless of who ended the

affair, their relationship became strained at the commencement of Dr. Fielden's research contract. Eventually, the situation culminated in Dr. Fielden complaining to Dr. Ehleringer, the biology department chair and Dr. Lighton's supervisor, of sexual harassment and retaliatory actions by Dr. Lighton.[1]

In response to Dr. Fielden's complaints, Dr. Ehleringer contacted the Dean's office, the University's Office of General Counsel and the campus Office of Equal Opportunity. In January 1995, a series of meetings commenced between Dr. Lighton, Dr. Ehleringer, the Dean of the College of Science, and Ms. McCreary–an assistant general counsel for the University. In these meetings, they discussed the need to amicably resolve the conflict and to obtain a neutral person to act as an intermediary. They also advised Dr. Lighton a letter might be placed in his file if he did not refrain from taking perceived retaliatory actions against

---

[1] Specifically, beginning in late November 1994, Dr. Fielden complained to Dr. Ehleringer that Dr. Lighton threatened to fire her and make her life difficult. In December, she complained Dr. Lighton posted an advertisement on her laboratory door seeking a replacement for her job and that Dr. Lighton accused her of spreading rumors about him. Later, in January 1995, she presented Dr. Ehleringer with a letter from Dr. Lighton, stating he would not tolerate complaints made behind his back. She also presented Dr. Ehleringer with a letter dated December 26, 1994, in which Dr. Lighton requested she produce, within the next four days during the holiday season, a summary of all her work to date and plans for the next several months. Another letter from Dr. Lighton criticized her for not exchanging Christmas gifts with him. She also furnished Dr. Ehleringer a copy of the job advertisement Dr. Lighton posted on her laboratory door.

Dr. Fielden.

On January 26, 1995, Dr. Ehleringer wrote Dr. Lighton a letter recognizing him as a "very valued member" of his department, offering to act as a first-round mediator between Dr. Lighton and Dr. Fielden, and proffering his support and hope for a quick resolution of their conflict. He also drafted a memo to both Dr. Lighton and Dr. Fielden urging them to seek help from an individual outside of the biology department to mediate their conflict.

Two weeks later, Dr. Lighton and Dr. Fielden voluntarily met with a professional University mediator. This meeting culminated in Dr. Lighton believing they reached a mutually acceptable agreement. Dr. Lighton later approved the written draft agreement that presumably embodied the terms of the two parties. The draft agreement included a provision requiring the parties to refrain from making disparaging remarks to third parties about each other outside each other's presence. However, the draft agreement also contained a provision abolishing Dr. Fielden's three-year contract and placing her on six-months probation. Shortly thereafter, Dr. Fielden retained counsel who wrote Dr. Ehleringer a letter accusing Dr. Lighton of sexual harassment and retaliation against Dr. Fielden.

In March 1995, Ms. McCreary met with Dr. Lighton to discuss Dr. Fielden's allegations and allow him to communicate his version of events. At that time, Dr. Lighton informed Ms. McCreary of his efforts to contact Dr. Fielden's previous colleagues and advisors in an attempt to dig up information on her early experiences as well as her "craziness and pathological nature." Ms. McCreary advised Dr. Lighton this action could be perceived as retaliatory and he should proceed carefully in his conduct regardless of the merit of Ms. Fielden's sexual harassment claim. Dr. Lighton also presented Ms. McCreary with a letter he prepared accusing Dr. Fielden of unauthorized use of a South African university's equipment since July 1994.[2] Shortly thereafter, he sent another letter to Ms. McCreary indicating he no longer wished to employ Dr. Fielden, again raising the equipment issue.

On March 30, 1995, Dr. Fielden filed a formal sexual harassment and retaliation complaint with the Utah Anti-Discrimination Division against the University's biology department.[3] In response, Dr. Lighton offered to "refrain in

_____

[2] The equipment consisted of a gas analyzer allegedly taken from the University of Bophutatswana.

[3] In her complaint, Dr. Fielden accused Dr. Lighton of continuing to retaliate against her after their affair concluded by: 1) failing to assist her with her experiments; 2) isolating her from the laboratory; 3) excluding her from interacting with other research colleagues; 4) interfering with her personal affairs;

a legally binding manner from making any negative comments concerning Dr. Fielden to anyone, and undertake not to damage or undermine her research career in anyway." At an April 5, 1995 meeting with Ms. McCreary over Dr. Fielden's request for a $15,000 settlement, Dr. Lighton offered to use his Packard Fellowship fund to pay Dr. Fielden *in absentia* if she prepared papers on their project. Meantime, at a subsequent biology department executive committee meeting, Dr. Ehleringer announced someone filed a sexual harassment complaint against the department, but declined to cite Dr. Lighton's involvement, even when specifically asked.

Thereafter, Dr. Fielden's attorney proposed a settlement of her claims on certain conditions, including the condition Dr. Lighton refrain from notifying the National Institute of Health of any adverse information about her, or if he had already contacted the Institute, to rectify the situation. By written response, Dr. Lighton agreed to this condition, but when Dr. Fielden insisted he sign the agreement, he refused. In a letter drafted by his attorney, Dr. Lighton stated he would not pay a settlement to Dr. Fielden with his grant money and complained

---

making verbal threats and telephone calls; 5) threatening to terminate her employment; 6) posting an opening for her job after threatening termination; and blocking funding for her to participate and deliver a paper at an international congress.

that, even though he did not intend to make disparaging comments about Dr. Fielden, he would not sign an agreement preventing him from disclosing her inappropriate actions should an investigation arise.

On May 14, 1995, Dr. Ehleringer sent Dr. Lighton a letter directing him to: 1) sign the settlement agreement, noting it did not include any admission of wrongdoing by Dr. Lighton; 2) file his complaint against Dr. Fielden internally, instead of with the National Institute of Health, as required by federal procedures; and 3) refrain from making any disparaging remarks about her to any third party. Most importantly, the letter stated failure to comply would "result in the initiation of disciplinary action ... that may result in the imposition of serious sanctions, including termination of your employment with the University." The next day, Dr. Lighton's attorney acknowledged his understanding, after communicating with Ms. McCreary, that no disciplinary action would rise from Dr. Lighton reporting Dr. Fielden's alleged "malfeasance" or misappropriation of the equipment to the University or the National Institute of Health.

Almost one month later, Dr. Fielden, Dr. Lighton, and the University entered into the settlement agreement, which included Dr. Lighton's requested provision he could disclose information about Dr. Fielden to third parties,

provided he simultaneously notify her, through her attorney, of such disclosure. The agreement also expressly disclaimed any wrongdoing or liability by Dr. Lighton or the University.  Under the terms of the agreement, Ms. Fielden agreed to withdraw her formal complaint and resign from her three-year employment contract in order to obtain employment elsewhere.  In addition, the settlement money did not come out of Dr. Lighten's grant or fellowship monies, but from the Utah State Division of Risk Management.

Both Dr. Ehleringer and Ms. McCreary supported the settlement with Dr. Fielden, primarily because they believed Dr. Lighton's actions could potentially be perceived as retaliatory.[4]  In addition, Ms. McCreary believed it prudent to

---

[4] Besides the retaliatory actions cited by Dr. Fielden directly to Dr. Ehleringer and in her complaint, Ms. McCreary and Dr. Ehleringer also believed other actions taken by Dr. Lighton's could be perceived as retaliatory.  These included Dr. Lighton's:  1) request the biology department's accountant obtain Dr. Fielden's long distance phone records and gather information on her use of National Institute of Health grant funds for supplies and travel; 2) timing in alleging Dr. Fielden stole equipment, which he did not raise until she brought sexual harassment and retaliation charges against him; 3) request to others to write a letter exonerating him over Dr. Fielden; 4) tone in his Christmas letter to Dr. Fielden chastising her for refusing to exchange gifts; 5) admission he was contacting associates of Dr. Fielden, raising question about her competence and mental stability; 6) attempt to get a mediation agreement canceling her three-year contract and placing her on six-months probation; 7) attempt to change the sick-leave policy to prevent Dr. Fielden from visiting her ill father; and 8) claim diseased ticks under Dr. Fielden's care escaped, which he knew was false and quickly recanted once the laboratory became quarantined.

settle with Dr. Fielden, not because she necessarily believed Dr. Fielden's side of the story over Dr. Lighton's, but because of her assessment on the University's potential legal exposure.

Two weeks after signing the settlement agreement, Dr. Lighton signed a non-tenure employment offer with the University of Las Vegas, and on the same day, resigned. In his resignation letter, Dr. Lighten simply stated:

> The actions of the University of Utah have made it impossible for me to retain my academic post in the Biology Department without compromising my respect for both this institution and myself.

> Following Dr. Lighton's resignation, Dr. Ehleringer sent a notice to the

biology department's faculty merely announcing another university attracted Dr. Lighten away. At the following biology department executive committee meeting, Dr. Ehleringer advised members of the withdrawal of the sexual harassment and retaliation complaint against the department, and also commented on their fortune in resolving the situation so quickly.[5]

It is important to note that prior to tendering his June 1995 resignation, Dr. Lighton contacted the University of Las Vegas as early as 1992 seeking

---

[5] Later, Dr. Ehleringer noted biology department members eventually figured out Dr. Lighton's involvement simply by making the "linkage" between Dr. Fielden's settlement and Dr. Lighton's resignation.

employment, writing:

> Your department at [the University of Las Vegas] is plainly going places, and the opportunity to play a role in the development of a growing dynamic department is simply too exciting to let slip by.

In late 1994, Dr. Lighton also talked with University of California personnel about future employment, basing his desire to leave the University on Dr. Ehleringer's refusal to find additional research space for him. Even before his January 1995 meetings with Ms. McCreary to discuss Dr. Fielden's charges, Dr. Lighton contacted the University of Las Vegas and three other universities in an effort to seek employment. Subsequently, in a May 1995 interview, Dr. Lighton gave the following statement to a University of Las Vegas job recruiter as to why he wanted to leave the University:

> I have never been happy with Salt Lake City as a social or intellectual environment, and I have been still less content with the University. Essentially, I have found myself increasingly intellectually isolated between extreme and rancorous camps of reductionists and anti-reductionists. Promised positions for colleagues in disciplines related to mine have been repeatedly scuttled by in-fighting .... Allied to this are problems I have had with unethical behavior on the part of certain high-ranking University officials. I no longer wish to work here; my decision is not whether to move, but when .... I find [the University of Las Vegas] especially attractive because of the high quality of its faculty and graduate students, its location, and because of the presence among your faculty of colleagues with whom I have enjoyably and constructively interacted in the past ...."

> Since his June 1995 resignation and acceptance of the University of Las

-10-

Vegas non-tenure position, Dr. Lighton has not obtained a tenure or "tenure-track" position. However, he admits he is unaware of any communications about him between the University and the University of Las Vegas, or of Ms. McCreary saying anything to damage his reputation. Mr. Lighton also does not dispute he received superlative annual performance evaluations from Dr. Ehleringer before and during the period in question. In fact, as late as February 3, 1995, after Dr. Ehleringer became aware of Dr. Fielden's complaints and some of Dr. Lighton's perceived retaliatory actions, Dr. Ehleringer nevertheless gave Dr. Lighton a superlative annual performance review, calling him a "rising star." Even Dr. Lighton admitted this performance review indicated "a strong expression of support" for him.

## PROCEDURAL BACKGROUND

One year after his resignation, Dr. Lighton brought a §1983 complaint against Dr. Ehleringer and Ms. McCreary, alleging their actions forced him to involuntarily resign. He claimed he was "constructively terminated" and deprived of his property right and liberty interest in his continued employment without due process of law or an opportunity to rebut defamatory accusations made against him. He also alleged Ms. McCreary's and Dr. Ehleringer's actions infringed his free speech to comment on Dr. Fielden's unauthorized use of

laboratory equipment. Finally, Dr. Lighton claimed Dr. Ehleringer "orally published" statements, accusing him of unprofessional and unlawful conduct, which adversely affected his liberty interest in his good will and reputation.[6]

The district court issued a bench ruling accepting as uncontroverted their statement of undisputed material facts[7] and granting Dr. Ehleringer's and Ms. McCreary's motion for summary judgment. The district court determined qualified immunity barred Dr. Lighton's claims against Dr. Ehleringer and Ms. McCreary because no constitutional violation occurred and their actions were reasonable and necessary to protect the interests of the University. In support, the district court found no triggering of any due process right on the constructive termination claim because Dr. Lighton voluntarily resigned, as evidenced by: 1) his active quest in seeking employment elsewhere; 2) the fact he obtained a job

---

[6] While Dr. Lighton brought additional allegations against the University, Dr. Ehleringer, and Ms. McCreary, those issues were resolved prior to the summary judgment determination at issue here and are not appealed.

[7] The only "facts" Dr. Lighton did not contest, as presented by Dr. Ehleringer and Ms. McCreary in their summary judgment motion and brief, involved whether Dr. Lighton received a "reasonable alternative" to resignation and "concurred" with the settlement agreement. He also alleged additional material facts existed to prevent summary judgment disposition. On appeal, Dr. Lighton continues to contend additional disputed facts exist which must prevent summary judgment determination, which we examine later in this decision.

before resigning, and 3) his leaving the University on his own terms and schedule. The court further found the May 14, 1995 letter, threatening possible termination if Dr. Lighton did not cease his retaliatory conduct, constituted the only adverse consequence, and merely an "interim imposition on [Dr.] Lighton's activities."

As to Dr. Lighton's liberty interest in name and reputation, the district court found he did not meet any of the requisite requirements of showing Dr. Ehleringer's statements: 1) impugned his name, reputation, honor or integrity; 2) were false; 3) occurred in the course of his termination or foreclosed other employment opportunities, or 4) were published. Finally, under the appropriate balancing test, the district court found no infringement of Dr. Lighton's free speech because it did not touch on a matter of public concern. The court also found the timing and nature of Dr. Lighton's allegations about Dr. Fielden's improperly taking equipment "suspect" and more of a "personal vendetta" than public speech in the public's interest. Even if his speech on this topic did meet the "public concern" requirement, the district court determined Ms. McCreary and Dr. Ehleringer possessed a right to restrict his speech to prevent the disruption of official function and insure effective employee performance.

DISCUSSION

On appeal, Dr. Lighton raises essentially the same claims addressed by the district court in its summary judgment determination. In their response, Dr. Ehleringer and Ms. McCreary fully support the district court's decision.

## A. Standard of Review

In reviewing the district court's summary judgment decision, we follow the standard we articulated in *Romero v. Fay*, 45 F.3d 1472 (10th Cir. 1995). In so doing, we review the district court's finding of qualified immunity *de novo*, reviewing the evidence in the light most favorable to Dr. Lighton as the nonmoving party. *Id.* at 1475. However, as we noted in *Romero*, we review summary judgment decisions involving qualified immunity somewhat differently than other summary judgment rulings. *Id.* To reach the question of whether Ms. McCreary and Dr. Ehleringer are entitled to qualified immunity, we must first ascertain, by *de novo* review, whether Dr. Lighten sufficiently asserted the violation of a constitutional right. *Id.* In order to carry his burden, Dr. Lighton must do more than abstractly identify an established right, but must specifically identify the right and conduct by Ms. McCreary and Dr. Ehleringer which violated that right. *Id.* Once Dr. Lighton sufficiently alleges the conduct violated clearly established law, then Ms. McCreary and Dr. Ehleringer bear the burden of showing no material issues of fact remain to defeat their claim of qualified

-14-

immunity.  *Id.*

### B.  Constructive Termination

With these standards in mind, we first turn to Dr. Lighton's claim Dr. Ehleringer and Ms. McCreary somehow denied him a property right or liberty interest in his continued employment at the University by constructively terminating him without due process of law.  In support of his constructive termination claim, Dr. Lighton argues he never received any alternative to resignation because he was coerced into signing the settlement agreement on threat of termination.  Specifically, Dr. Lighton relies on Dr. Ehleringer's May 14, 1995 letter to show the only choice given to him was to either submit to "a gag order" or face termination.

We begin by resolving whether Dr. Lighton possessed a property interest in his position with the University.  It is well-established constructive discharge from employment is actionable under § 1983 if an employee possesses a protectable property or liberty interest in his employment.  *Woodward v. City of Worland,* 977 F.2d 1392, 1401 (10th Cir. 1992) (citing *Bailey v. Kirk*, 777 F.2d 567, 579 (10th Cir. 1985)), *cert. denied*, 509 U.S. 923 (1993).  In the employment context, the Supreme Court defines a property interest "as a legitimate

expectation in continued employment." *Lenz v. Dewey*, 64 F.3d 547, 551 (10th Cir. 1995) (relying, in part, on *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)). We determine whether such a property interest exists by looking at state law. *See Watson v. University of Utah Med. Ctr,*, 75 F.3d 569, 577 (10th Cir. 1996). Under Utah law, an employment contract with no specified term of duration is an at-will relationship and the employer may terminate such employment at any time. *Id.* at 577-78 (citations omitted). In such instances, no property interest exists.

In this case, the University employed Dr. Lighton as a non-tenured professor, even though the University characterized him as a "tenure-track" professor. Dr. Lighton fails to point to any contract showing a specific term of employment existed nor identify any Utah statutes or University policy on which his alleged property interest is grounded. 75 F.3d at 578. Because insufficient evidence exists in the record to show he possessed a property right to his continued employment, under either state law or some internal University policy, we cannot conclude any property right existed.[8] *Id.*; *see Lenz,* 64 F.3d at 551-52.

---

[8] Moreover, during oral argument Dr. Lighton's counsel conceded Dr. Lighton may not have a property right in his non-tenure position with the University, but nevertheless argued Dr. Lighton's liberty interest in his continued employment was violated by his constructive termination without due process. Under either scenario, we hold Dr. Lighton's resignation did not constitute

Even if Dr. Lighton did possess a property right or liberty interest in his continued employment, we hold the district court correctly determined he voluntarily resigned his position. In determining whether a resignation is voluntary or involuntary, we use a "reasonable person test." *Yearous v. Niobrara County Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997), *cert. denied*, 523 U.S. 1074 (1998). The question is not whether working conditions become difficult or unpleasant. *Id.* at 1357. Rather, a resignation is only considered involuntary if the working conditions are viewed as so intolerable, a reasonable person would feel compelled to resign. *Id.* at 1356. In other words, Dr. Lighton must show he had "no other choice but to quit." *Id.* (quoting *Woodward*, 977 F.2d at 1401 , quoting *Irving v. Dubuque Packing Co.*, 689 F.2d 170, 172 (10th Cir. 1982) (quotation marks omitted)). We determine the voluntariness of Dr. Lighton's resignation under the totality of the circumstances, including whether he: 1) received some alternative to resignation; 2) understood the nature of his choice; 3) had a reasonable time in which to choose, and 4) was permitted to select the effective date of his resignation. *See Yearous*, 128 F.3d at 1356.[9]

constructive termination.

[9] In *Yearous*, hospital nurses quit their jobs after claiming their supervisor wanted them to compromise their ethics. 128 F.3d at 1357. We held they voluntarily resigned because they were given the choice of leaving or continuing their employment with the hospital while they attempted to resolve their problems with their supervisor through a formal hearing. *Id.* Dr. Lighton suggests his case

In determining the voluntariness of Dr. Lighton's resignation, we point out Dr. Ehleringer's May 14, 1995 letter offered Dr. Lighton a choice of signing the settlement agreement or *possibly* facing disciplinary proceedings. The letter did not require mandatory termination or resignation if he did not sign the settlement agreement. Thus, under the first factor we consider, it is clear Dr. Ehleringer offered Dr. Lighton something other than mandatory resignation. In situations even more explicit or denotative than here, "[w]e have held that offering an employee a choice between resignation and termination does not violate an employee's due process of law, as long as the resignation is 'voluntary.'" *Lenz*, 64 F.3d at 552 (citing *Parker v. Board of Regents*, 981 F.2d 1159, 1162 (10th Cir. 1992)).

In proceeding to examine the voluntariness of Dr. Lighton's resignation, we look at the second factor and find nothing shows Dr. Lighton did not understand his alternatives,[10] even though he obviously considered one of the alternatives –

is distinguishable from *Yearous* because the nurses were given an alternative of continuing to work, while the only alternative he received consisted of entering into a "gag order" or resigning. We disagree. As explained in our discussion, Dr. Lighton freely chose resignation, and his employment would have continued whether he signed the settlement agreement or not, even though the possibility of discipline proceedings may have loomed ahead.

[10] This is supported by the fact legal counsel represented Dr. Lighton at the time in question.

the possibility of disciplinary proceedings – an unpleasant one.[11]  As to the other factors outlined above, Dr. Lighton took three weeks after receiving the May 14 letter to sign the settlement agreement, and an additional two weeks after signing the agreement to tender his resignation.  Under these circumstances, Dr. Lighton received a reasonable length of time to make his choice and clearly selected his own resignation date.

We do not end our discussion here, but continue to examine Dr. Lighton's constructive termination claim by looking at the totality of the circumstances.  We find it important Dr. Lighton actively sought other employment well before the January 1995 meetings began over Dr. Fieldon's complaints and while he remained on a "tenure track" at the University and continued to receive superlative reviews.  Equally telling is the fact Dr. Lighton gave academic and social reasons for leaving the University which are inconsistent with the reasons

---

[11]  The crux of Dr. Lighton's constructive termination claim centers mainly on the fact the May 14 letter indicated termination could result from discipline proceedings.  While we acknowledge disciplinary proceedings may have ensued, it does not mean termination would automatically result, especially in light of the fact Dr. Ehleringer considered Dr. Lighton a valued member of his department and gave him superlative performance reviews.  Moreover, even if Dr. Lighton did possess some property right in his continued employment, he fails to show he did not understand University procedures regarding his due process rights in such a disciplinary hearing.

given during the course of this litigation. Under these circumstances, it is clear Dr. Lighton intended to leave the University long before the announcement or escalation of Dr. Fielden's charges and for reasons other than the settlement he allegedly felt compelled to enter. Because we find Dr. Lighton voluntarily resigned his position, we determine no constructive termination occurred and thus, no due process deprivation existed.

### C. Liberty Interest in Name and Reputation

We next address Dr. Lighton's contention Dr. Ehleringer's statements affected his liberty interest in his good name and reputation.[12] For the purpose of evaluating Dr. Lighton's argument, we assume he possessed a liberty interest in his continued employment at the University. However, in order to succeed, Dr. Lighton must show how Dr. Ehleringer infringed that interest. *See Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994), *cert. denied*, 514 U.S. 1015 (1995). First, Dr. Lighton must show Dr. Ehleringer's statements impugned his "good name, reputation, honor or integrity." *Id.* Second, Dr. Ehleringer's statements must have been false. *Id.* Third, his statements must have occurred in the course

---

[12] We exercise our discretion to address this contention even though Dr. Lighton failed to set forth any authority supporting it. *Cf. Primas v. City of Oklahoma City*, 958 F.2d 1506, 1511 (10th Cir. 1992).

of terminating Dr. Lighton or must have foreclosed other employment opportunities. *Id.* And finally, his statements must have been published. *Id.* We have said these four elements are not disjunctive – *i.e.*, all four elements must be satisfied to demonstrate deprivation of Dr. Lighton's liberty interest. *Id.*

In this case, Dr. Ehleringer informed the biology department's executive committee a sexual harassment and retaliation complaint had been filed against the department, and later advised them of the withdrawal of that complaint. We find nothing to show Dr. Ehleringer's statements in anyway impugned Dr. Lighton's good name, reputation, honor, or integrity. This alone is sufficient reason to conclude no violation of Dr. Lighton's liberty interest occurred. Moreover, as the trial court found, nothing shows Dr. Ehleringer made untruthful statements about Dr. Lighton, or that his statements caused him to resign. We also reject Dr. Lighton's allegations Dr. Ehleringer's speech caused him to lose employment opportunities elsewhere for the reasons stated, and because we find Dr. Lighton's alleged loss of future employment too speculative and intangible to constitute a deprivation of a liberty interest. *See Workman,* 32 F.3d at 481. Under the circumstances presented, we hold Dr. Ehleringer clearly did not violate Dr. Lighton's liberty interest, and therefore, no due process violation occurred.

## D. Right of Free Speech

In support of his protected speech argument, Dr. Lighton suggests Ms McCreary and Dr. Ehleringer failed to make a good faith effort to resolve his First Amendment concerns and in fact, violated his First Amendment rights by requiring him to remain silent on a matter of public concern regarding Dr. Fielden's unauthorized use of equipment.[13]

It is well established a government employer, such as the University or its officials, "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Lytle v.*

---

[13] In his appeal brief, Dr. Lighton also complains Dr. Ehleringer and Ms. McCreary prevented him from voicing his concerns to the National Institute of Heath on the University's mishandling of federal research funds and involvement in insurance fraud. The only reference Dr. Lighton points to in the record to support this allegation is one conclusory, self-serving sentence in his brief in opposition to the summary judgment motion claiming "misuse or misapplication of federal research monies at the University of Utah." In his complaint, Dr. Lighton also generally alleges Dr. Ehleringer and Ms. McCreary attempted to use federal funds to pay Dr. Fielden's settlement sum, but we are uncertain if this is the misuse of which Dr. Lighton complains of on appeal. Reviewing the record as a whole, we find Dr. Lighton's summary allegations insufficient to raise a protected speech claim on these issues. Moreover, nothing in the record shows Dr. Ehleringer and Ms. McCreary ever attempted to restrict Dr. Lighton's speech on any topic concerning any mishandling of research funds or insurance fraud. Because we will not usually consider issues raised for the first time on appeal, *Walker v. Mather (In re Walker)*, 959 F.2d 894, 896 (10th Cir. 1992), or conclusory and unsupported allegations, *Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir. 1981), we decline to address these issues here.

*City of Haysville*, 138 F.3d 857, 863 (10th Cir. 1998) (quotation marks and citation omitted). In evaluating a protected, freedom of speech argument, we rely on the Supreme Court's balancing test, first articulated in *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968). The *Pickering* balancing test has developed into a four-step analysis, under which we must determine: 1) if Dr. Lighton's speech is of public concern; 2) if it is, we must balance the interest of his freedom of expression with the University's interest in preventing disruption of official function and promoting the efficiency of public service through its employees; 3) if the balance tips in Dr. Lighton's favor, he must prove the speech was substantial or a motivating factor in the detrimental employment decision; and 4) finally, we must give the University, or in this case, Ms. McCreary and Dr. Ehleringer, an opportunity to prove the same decision would have been reached, even absent the protected conduct. *See Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996).

In order for Dr. Lighton to succeed, the first step of the *Pickering* balancing test must be established. In other words, we need not go further if we determine Dr. Lighton's speech, in accusing Dr. Fielden of unauthorized use of equipment, does not rise to "a matter of public concern." We have defined matters of public concern as "those of interest to the community, whether for

social, political, or other reasons." *Lytle*, 138 F.3d at 863. In analyzing whether speech constitutes a matter of public concern, we may focus on the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest. *See McEvoy v. Shoemaker*, 882 F.2d 463, 466 (10th Cir. 1989) (relying on *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988)). For example, when the identified speech focuses on disclosing a public official's malfeasance or wrongdoing, it is most likely a matter of public concern. *See Schalk v. Gallemore*, 906 F.2d 491, 494 (10th Cir. 1990). Conversely, it "is generally not [considered] protected speech if [its] aim is simply to air grievances of a purely personal nature." *Id.*

In applying these principles, it does not appear Dr. Lighton's speech about Dr. Fielden's alleged unauthorized use of property rose to that of "public concern," but – as the district court said – was more of a "vendetta." The record discloses Dr. Lighton knew about Dr. Fielden's alleged unauthorized use of the equipment, but did not report it until nine months later – immediately after Dr. Fielden raised sexual harassment and retaliation charges against him.[14]  Under

---

[14] Contrary to Dr. Lighton's contentions, the facts in his case are not similar to those in *Powell v. Gallentine*, 992 F.2d 1088 (10th Cir. 1993). In *Powell*, unlike here, the professor's allegations of grade fraud did not stem from personal motives. *Id.* at 1090-91.

these circumstances, we are persuaded Dr. Lighton did not disclose the information concerning the equipment for the principal aim or Good Samaritan purpose of disclosing "government misconduct," but for his own personal reasons for either getting even with, or using leverage against, Dr. Fielden.[15]

As to Dr. Lighton's characterization of Dr. Ehleringer's letter as placing a "gag order" on his free speech,[16] we disagree. Long before Dr. Ehleringer's May 14, 1995 letter demanding Dr. Lighton not make disparaging remarks about Dr. Fielden, Dr. Lighton twice expressed an interest in an agreement which included a provision preventing third-party disclosures. With respect to Dr. Lighton's reporting unauthorized equipment use, the same letter simply demanded Dr. Lighton go through the proper channels by reporting it to the University, rather than the National Health Institute. In the event Dr. Lighton did not understand

---

[15] We also question, but do not decide, whether the unauthorized use of a foreign university's equipment by a subordinate, foreign contract researcher rises to a matter of public concern involving the community's, let alone this country's, social or political interest, especially when it also does not involve the misconduct of a government official.

[16] Dr. Lighton contends the "gag order" on reporting Dr. Fielden's unauthorized use of equipment restricted both his free speech to report criminal conduct and his ability to "supervise and discipline."However, it is unclear how any restriction on Dr. Lighton's reporting Dr. Fielden's unauthorized use of equipment affected his ability to "supervise and discipline," especially given Dr. Fielden left the University and no longer remained under his supervision.

this distinction or the topics that might trigger disciplinary proceedings, he certainly should have understood them by the next day when his attorney acknowledged his understanding the sanction provision of the letter did not extend to Dr. Lighton's reporting Dr. Fielden's alleged misconduct to the University, or even to the National Institute of Health. In addition, the settlement allowed Dr. Lighton to disclose information about Dr. Fielden to third parties, provided he simultaneously notifies her, through her attorney, of such disclosure. Under the circumstances, we cannot say this constitutes a "gag order." Having determined Dr. Lighton's speech on Dr. Fielden's actions did not rise to that of a matter of public concern, we need go no further to conclude his free speech argument lacks merit.

### E. Additional Disputed Facts

As to the appropriateness of summary judgment disposition in this case, we point out Dr. Lighton did not contest the facts presented by Dr. Ehleringer and Ms. McCreary in their summary judgment motion and brief, other than to claim additional disputed facts existed to prevent summary judgment disposition, and to dispute whether Dr. Lighton received a "reasonable alternative" to resignation and "concurred" with the settlement agreement. On appeal, Dr. Lighton continues to contend additional, disputed facts exist concerning: 1) the merit of Dr. Fielden's

sexual harassment and retaliation claims; 2) his perceived view of Ms. McCreary's and Dr. Ehleringer's malice towards him as evidenced, in part, by their facial expressions and other intimations; 3) the inadequacy of their investigation into Dr. Fielden's claims; and 4) his subjective view he was constructively terminated. For these reasons, he purports the district court erred in granting summary judgment.

Although we view the evidence and draw all inferences in the light most favorable to Dr. Lighton as the party opposing summary judgment, he must identify sufficient evidence of material disputed facts to require submission of the case to a jury. *Langley v. Adams County*, 987 F.2d 1473, 1476 (10th Cir. 1993) (quotation marks and citation omitted). To determine what facts are material to summary judgment disposition, we look to the primary issues in this case, which involve Dr. Lighton's claims of constructive termination, a violation of his liberty interest in his name and reputation, and a restriction on his protected speech. In making a determination on these issues, we find the veracity of Dr. Fielden's sexual harassment and retaliation allegations against Dr. Lighton irrelevant or immaterial.

Obviously, Dr. Fielden's allegations began the chain of events leading to

the controversy over Dr. Lighton's signing the settlement agreement. As a consequence, any significance we attach to them stems merely from the fact they were made, resulted in Dr. Ehleringer reporting Dr. Fielden's formal complaint against the department to its executive committee, influenced Dr. Ehleringer's and Ms. McCreary's desire to settle the dispute between Dr. Lighton and Dr. Fielden, and resulted in the settlement agreement, containing a provision on reporting allegations of improper acts to third parties, which Dr. Lighton contends he felt compelled to sign. Thus, while Dr. Fielden's allegations lead to the instant litigation, we find the truth of those allegations does not affect resolution of the issues at dispute. Because we hold any disputed facts as to the merits of Dr. Fielden's claims are immaterial to our decision, we also hold the adequacy of Dr. Ehleringer's and Ms. McCreary's investigation into them is immaterial.

We next direct our attention to Dr. Lighton's subjective perception Ms. McCreary and Dr. Ehleringer felt malice toward him and their actions caused him to involuntarily resign. In reviewing his allegations of constructive termination, Dr. Lighton's subjective view of the situation is clearly irrelevant. *See Yearous*, 128 F.3d at 1356. Therefore, his subjective views on Dr. Ehleringer and Ms. McCreary's perceived facial expressions and other intimations are irrelevant to our decision. Because we have already thoroughly discussed the undisputed facts

we believe pertinent to making a summary judgment determination in this case, we will not repeat our analysis here. In sum, Dr. Lighton fails to identify evidence of additional undisputed, material facts sufficient to require submission of his case to a jury. *See Langley*, 987 F.2d at 1476. For these reasons, we hold the district court did not err in disposing of this matter by summary judgment decision.

## F. Ms. McCreary's Affidavit

As a procedural matter, the district court issued a bench ruling denying Dr. Lighton's motion to strike Ms. McCreary's supplemental affidavit, determining it did not violate "standard practice," and contained information "relevant" to Dr. Lighton's reply and admissible as evidence. According to Dr. Lighton, the district court erred in its ruling because Ms. McCreary's untimely affidavit constituted an attempt to "patch up ... factual holes" in her and Dr. Ehleringer's summary judgment brief.

We begin by noting Ms. McCreary filed her affidavit three weeks prior to the summary judgment hearing in response to Dr. Lighton's memorandum opposing her summary judgment motion and brief. Her supplemental affidavit simply explains the University maintained an interim policy for investigation into

research misconduct, and that Dr. Lighton did not to file a formal complaint against Dr. Fielden under that policy, but instead filed his complaint with the National Institute of Health. It further verifies the Institute investigated Dr. Lighton's accusations and exonerated the University and Dr. Fielden.

Rule 6(d) of the Federal Rules of Civil Procedure states "[w]hen a motion is supported by affidavit, the affidavit shall be served with the motion." However, under Rule 56(e): "The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories or further affidavits. Thus, the district court clearly has discretion to permit supplemental affidavits it finds useful for summary judgment determination. In this case, the district court found Ms. McCreary's supplemental affidavit contained information "relevant" and admissible as evidence. A review of the record convinces us the district court did not abuse its discretion in denying Dr. Lighton's motion to strike her affidavit. Moreover, even if we agreed with Dr. Lighton and considered only facts outside of Ms. McCreary's supplemental affidavit, it would not alter our decision the district court properly granted summary judgment.

CONCLUSION

Having conducted a *de novo* review of the district court decision granting summary judgment to Ms. McCreary and Dr. Ehleringer on the issue of qualified immunity, we hold Dr. Lighten has failed to make the requisite showing of a violation of any constitutional right. *See Romero*, 45 F.3d at 1475. As a result, we conclude Ms. McCreary and Dr. Ehleringer are entitled to qualified immunity from suit. *Id.* For these reasons, we **AFFIRM** the district court's decision granting summary judgment to Ms. McCreary and Dr. Ehleringer.