**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 12, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JODY BRAMMER-HOELTER;
LAURA KILDUFF; MELISSA
PERRY; AMY SULZBACH;
SHELLEY CREWS; BONNIE
GOULD,

      Plaintiffs - Appellants,

v.

TWIN PEAKS CHARTER
ACADEMY; ST. VRAIN VALLEY
SCHOOL DISTRICT NO. RE-1J;
DOROTHY MARLATT,

      Defendants - Appellees.

No. 06-1186

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 99-K-1481)**

---

John R. Olsen, Olsen & Brown, L.L.C., Niwot, Colorado, for Plaintiffs -
Appellants.

Patrick B. Mooney (and M. Brent Case, Semple, Miller, Mooney & Farrington,
P.C., with him on the briefs), Denver, Colorado, for Defendants - Appellees.

---

Before **KELLY**, **BALDOCK**, and **GORSUCH**, Circuit Judges.

---

**KELLY**, Circuit Judge.

Plaintiffs appeal from the district court's opinion and order granting a motion for summary judgment filed by Defendants Twin Peaks Charter Academy ("the Academy") and Dr. Dorothy Marlatt and its related entry of judgment for all Defendants on all claims. Plaintiffs are former teachers of the Academy. Plaintiffs filed suit under 42 U.S.C. § 1983 asserting that Defendants violated their rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution. Specifically, Plaintiffs alleged that Defendants retaliated against them for exercising their freedom of speech and freedom of association rights, imposed an illegal prior restraint on their freedom of speech and freedom of association, and deprived them of procedural due process. Plaintiffs also asserted pendent claims for breach of contract and promissory estoppel under Colorado law. In its opinion and order, the district court discussed the freedom of speech retaliation claim, the due process claim, and the pendent state law claims for breach of contract and promissory estoppel. It then entered a related judgment in favor of all Defendants on all claims. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand.

## Background

The Academy is a K-8 charter school in Longmont, Colorado. It is chartered by, and operates within the boundaries of, the St. Vrain Valley School District ("the District"). Dr. Dorothy Marlatt was the principal of the Academy

when Plaintiffs were employed there as teachers. The events giving rise to this case occurred from the fall of 1998 to the spring of 1999 and ultimately culminated in Plaintiffs' resignations.[1]

The Academy first opened its doors in the fall of 1997. Plaintiffs were employed as teachers pursuant to written contracts with the Academy. The Plaintiffs allege that they were told the Academy "was founded upon, and would operate pursuant to, open discussions and communications, including among teachers and parents, regarding school activities and functions." Aplt. App. at 202. Plaintiffs were also informed of the Academy's grievance procedure, which stated that "[t]he Board of Directors, Administrator, and instructional and support staff . . . welcome constructive criticism and input motivated by a sincere desire to enhance the Academy's educational program, improve its working conditions, or provide additional opportunities for parental involvement." Id. at 321.

Plaintiffs received satisfactory performance reviews in their 1997-98 school year evaluations and each accepted a renewed contract for the 1998-99 school year. By the fall of 1998, however, Plaintiffs developed a number of concerns or grievances about the operation, management, and mission of the Academy. They began to meet off-campus and after hours at restaurants, in each others' homes, and at least once at a church to discuss these concerns. In response, Dr. Marlatt

---

[1] As discussed infra, the parties dispute whether Plaintiffs voluntarily resigned, were constructively discharged, or were fired.

issued a series of directives indicating Plaintiffs were not to discuss Academy matters outside of work with any person, including each other, ostensibly to keep personnel and student information confidential. One such order was made during a mandatory faculty meeting. Dr. Marlatt also told Plaintiffs she would prefer they not even associate with each other outside of school.

Nevertheless, Plaintiffs continued to meet off campus for the purpose of discussing various Academy matters. Some meetings were attended by parents and other members of the public. There were approximately twenty to twenty-five meetings in all. At some point, all of the Plaintiffs made their concerns and grievances known to the Twin Peaks Academy Board of Directors ("the Board"), after the Board invited them to communicate without fear of retaliation. Id. at 206-07. Plaintiffs contend that their grievances, expressed in writing and orally, were ignored.

A critical point in this case is whether the concerns and grievances discussed by Plaintiffs were matters of public concern. Plaintiffs note dozens of matters that were discussed at the various meetings and it would be cumbersome to discuss them all in this opinion. As explained below, the vast majority of the matters related to Plaintiffs' duties as teachers and/or addressed internal personnel and workplace disputes. A handful of the matters discussed, however, were unrelated to Plaintiffs' employment duties and constituted matters of public concern.

Dr. Marlatt informed the Board about Plaintiffs' meetings. She also compiled a list of suspected participants in the meetings and showed it to the Board. Sometime thereafter, Plaintiffs contend that they received less favorable performance reviews by Dr. Marlatt. When Plaintiff Kilduff asked Dr. Marlatt why she had received the less favorable review, Dr. Marlatt told her that "the gossip has got to stop," and that it was up to Plaintiff Kilduff to prove she was not gossiping. Id. at 1436. Defendants admit in their answer that no Plaintiff violated any Academy policies, codes, or procedures. Id. at 1444.

Plaintiffs contend that after they received their performance reviews, Dr. Marlatt began to ignore them when she passed them in the halls. Id. at 869. Plaintiffs testified that Dr. Marlatt slammed doors in their presence and generally behaved in a hostile manner toward them. Id. at 983-84. Plaintiffs testified that this treatment caused them various forms of severe distress.

Plaintiffs each drafted resignation letters which were dated either February 28 or March 1 of 1999. It appears that Plaintiffs placed the letters in the school mailboxes of each Board member and Dr. Marlatt. The letters specified that Plaintiffs' last day of work would be March 12, 1999. The Board met on March 2, 1999 to discuss the resignations. At the meeting, Board member Lorraine Baxter observed that Plaintiffs' resignations were likely related to their dissatisfaction with Dr. Marlatt. This prompted Dr. Marlatt to stand up and hand a written resignation to the Board president. Dr. Marlatt then immediately left the

meeting. On March 4, 1999, the Board met again to discuss finding replacements for Plaintiffs and Dr. Marlatt.

On March 5, 1999, Plaintiffs each submitted a letter attempting to "rescind" their resignations.[2] On March 6, 1999, the Board met again and announced the resignations of Plaintiffs and Dr. Marlatt. The Board then sent each Plaintiff a letter confirming that their last day of work would be March 12, 1999. On March 11, 1999, the Board met again. Board member Kathy Seitz made a motion to retain Plaintiffs, but the motion failed.

On March 12, 1999, Plaintiffs gathered their belongings and turned over their keys. Before leaving the Academy, however, at approximately 6:30 p.m., each Plaintiff handed the Academy's acting administrator a letter stating:

> Please be informed that, because no action has been taken on your part, I consider my resignation to be rescinded, as per my letter dated March 6, 2006. I continue to be an employee of Twin Peaks Charter Academy, and intend to report for work as usual on March 15, 1999.

Id. at 480. Plaintiffs also submitted a written grievance with the letter stating, inter alia:

> The Board of Directors has acted in bad faith in refusing to acknowledge or accept my letter dated March 6, 1999, in which I rescinded my resignation. . . .

> The administrator, with the full knowledge of the Board, acted in a manner which violated my 1st amendment rights under the U.S. Constitution.

---

[2] Although the record is unclear, it appears that Dr. Marlatt's resignation prompted Plaintiffs' change of heart.

. . . The semester evaluation which I received on February 25, 1999, did not accurately reflect the oral conference I had with Dr. Marlatt following her observation in January.

Id. at 484. In response, the Board immediately issued Plaintiffs a letter warning that they were neither expected nor permitted to report for work on March 15, 1999. Id. at 482. On May 18, 1999 the Board sent Plaintiffs a letter formally rejecting their grievances. The letter stated, inter alia: "Your grievance was not timely filed," and "[i]t is neither appropriate nor prudent for this Board to respond in this grievance to claims and issues which are likely to be the subject of your lawsuit against the School and this Board." Id. at 1425.

All Plaintiffs except Melissa Perry then re-applied for teaching positions with the Academy. The Academy had a procedure of sending response letters to all persons applying for a teaching position. An Academy clerk testified that such letters were prepared for Plaintiffs and given to the acting administrator and Board for transmitting. Plaintiffs never received the letters, however, prompting them to argue that they were "blacklisted" from future employment at the Academy because of the events involving Dr. Marlatt. Defendants contend that the Board had already made most of its hiring decisions by the time Plaintiffs submitted their applications and that it had legitimate concerns about the Plaintiffs' intent to serve for an entire school year given their prior resignations.

## Procedural History

Plaintiffs filed their lawsuit on July 30, 1999. All Defendants filed motions for summary judgment on October 23, 2000. Over five years later, on March 28, 2006, the district court issued an eighteen-page order granting the summary judgment motion filed by the Academy and Dr. Marlatt and denying the District's motion as moot.[3] See Brammer-Hoelter v. Twin Peaks Charter Acad., No. Civ. 99-K-1481, 2006 WL 827410 (D. Colo. Mar. 28, 2006). Addressing the freedom of speech retaliation claim, the district court held that the matters discussed by Plaintiffs were not matters of public concern and that Plaintiffs had failed to show an adverse employment action as a result of their speech. Id. at *3-5. With regard to Plaintiffs' procedural due process claim, the district court assumed that Plaintiffs had an interest in continued employment (at least until they resigned), but it found that they had failed to prove constructive discharge. Id. at *6. The district court then rejected Plaintiffs' contract and promissory estoppel claims under state law based on its determination that Plaintiffs had voluntarily resigned and that their resignations were effective. Id. at *7-8. The district court then entered judgment for all Defendants on all claims.

---

[3] The District argued that Plaintiffs had failed to show a policy or custom on its part sufficient to create liability under § 1983 and that the District had no contract with Plaintiffs and made no representations to them. See Aplt. App. at 255-65. The district court considered these arguments moot given that it had already disposed of Plaintiffs' claims on the merits in granting the Academy and Dr. Marlatt's motion for summary judgment.

On appeal, Plaintiffs argue that the district court erred in determining that the matters they discussed were not matters of public concern. Plaintiffs also argue that the retaliatory actions taken by Dr. Marlatt were sufficient to constitute adverse employment actions. Consequently, they argue that both their freedom of speech and freedom of association retaliation claims should survive summary judgment. Plaintiffs further argue that Dr. Marlatt's actions constituted an illegal prior restraint, which the district court ignored. They argue that the district court erred in rejecting their procedural due process claim both because it wrongly determined that they had voluntarily resigned and could not show constructive discharge and because it wrongly determined that the Academy's internal grievance policy did not create a protected property interest. Finally, Plaintiffs argue that the district court erred by dismissing their pendent state law claims because it ignored evidence of the Academy's course of dealing and prior assurances made to them.

**Discussion**

I.      **Standard of Review**

We review a district court's grant of summary judgment de novo, applying the same standard as the district court. Hackworth v. Progressive Cas. Ins. Co., 468 F.3d 722, 725 (10th Cir. 2006), cert. denied, – U.S.–, 75 U.S.L.W. 3521 (2007). Summary judgment is proper only if the record shows "that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Furthermore, because this case involves the First Amendment, we have "an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." Citizens for Peace in Space v. City of Colo. Springs, 477 F.3d 1212, 1219 (10th Cir. 2007).

## II. The First Amendment Claims

Plaintiffs advance three discrete claims under the First Amendment. The first is that they were retaliated against for exercising their freedom of speech. The second is that they were retaliated against for exercising their freedom of association. The third is that Dr. Marlatt's blanket prohibition on Plaintiffs discussing Academy matters in public and her statement that she would prefer Plaintiffs not meet together in public constituted an illegal prior restraint on speech and association. These are distinct claims. See Shrum v. City of Coweta, 449 F.3d 1132, 1138 (10th Cir. 2006) (distinguishing between freedom of speech and freedom of association retaliation claims); Milwaukee Police Ass'n v. Jones, 192 F.3d 742, 749-50 (7th Cir. 1999) (distinguishing between freedom of speech retaliation claims and prior restraint claims).

### A. Freedom of Speech Retaliation Claim

"When a citizen enters government service, the citizen by necessity must

accept certain limitations on his or her freedom." Garcetti v. Ceballos, 126 S. Ct. 1951, 1958 (2006). At the same time, "[t]he First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." Id. Consequently, when government employees speak on matters of public concern, "they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." Id.; see also Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968).

After the Supreme Court's recent decision in Garcetti, it is apparent that the "Pickering" analysis of freedom of speech retaliation claims is a five step inquiry which we now refer to as the "Garcetti/Pickering" analysis.[4] First, the court must determine whether the employee speaks "pursuant to [his] official duties." Garcetti, 126 S. Ct. at 1960; see also Mills, 452 F.3d at 647 ("Garcetti . . . holds that before asking whether the subject-matter of particular speech is a topic of

_____

[4] Prior to Garcetti, we described the inquiry as a four-part test. See, e.g., Lybrook v. Members of Farmington Mun. Schs. Bd. of Educ., 232 F.3d 1334, 1338 (10th Cir. 2000). Our initial cases after Garcetti also described the inquiry as a four-part test by simply combining the first two elements. See, e.g., Weaver v. Chavez, 458 F.3d 1096, 1099 (10th Cir. 2006) (noting that "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern"). Nevertheless, Garcetti made clear that the first step is to determine whether the employee speaks pursuant to his official duties. See Mills v. City of Evansville, 452 F.3d 646, 647 (7th Cir. 2006). Thus, Garcetti added an additional step to the analysis. District courts remain free, however, to skip the Garcetti analysis and dismiss or grant summary judgment on the basis of the traditional Pickering analysis when a claim clearly fails because the matters discussed are not matters of public concern.

public concern, the court must decide whether the plaintiff was speaking 'as a citizen' . . . ."). If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech "simply reflects the exercise of employer control over what the employer itself has commissioned or created." Garcetti, 126 S. Ct. at 1960. Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern. See Green v. Bd. of County Commr's, 472 F.3d 794, 798 (10th Cir. 2007); Mills, 452 F.3d at 647-48. If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends. Third, if the employee speaks as a citizen on a matter of public concern, the court must determine "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer." Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007). Fourth, assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a "substantial factor or a motivating factor in [a] detrimental employment decision." Lybrook, 232 F.3d at 1338 (internal quotation marks omitted). Finally, if the employee establishes that his speech was such a factor, "the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech." Id. at 1339 (internal quotation marks omitted). The first three steps are to be resolved by the district court, while the last two are ordinarily for the trier

of fact.  See Cragg v. City of Osawatomie, 143 F.3d 1343, 1346 (10th Cir. 1998).

### 1.    Speech Pursuant to Official Duties

In Garcetti, the Supreme Court declined to articulate a formula for determining when a government employee speaks pursuant to his official duties. See 126 S. Ct. at 1961.  However, cases interpreting Garcetti have made clear that speech relating to tasks within an employee's uncontested employment responsibilities is not protected from regulation.  See, e.g., Casey, 473 F.3d at 1329 (noting that when the speech concerns a matter within the employee's "portfolio" it is made "pursuant to her official duties"); see also Wilburn v. Robinson, 480 F.3d 1140, 1151 (D.C. Cir. 2007) (same).  This may be true even though the speech concerns an unusual aspect of an employee's job that is not part of his everyday functions.  See Battle v. Bd. of Regents, 468 F.3d 755, 761 n.6 (11th Cir. 2006) (per curiam).  Indeed, we have stated that speech is made pursuant to official duties if it is generally consistent with "the type of activities [the employee] was paid to do."  Green, 472 F.3d at 801.

An employee's official job description is not dispositive, however, because speech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform.  The ultimate question is whether the employee speaks as a citizen or instead as a government employee–an individual acting "in his or her professional capacity." See Garcetti, 126 S. Ct. at 1960.  Consequently, if an employee engages in speech

- 13 -

during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties. See Williams v. Dallas Indep. Sch. Dist., 480 F.3d 689, 693 (5th Cir. 2007) (per curiam).[5]  At the same time, not all speech that occurs at work is made pursuant to an employee's official duties. See Garcetti, 126 S. Ct. at 1959 ("Employees in some cases may receive First Amendment protection for expressions made at work.").  Nor is all speech about the subject matter of an employee's work necessarily made pursuant to the employee's official duties. Id. at 1959 ("The First Amendment protects some expressions related to the speaker's job.").  Instead, we must take a practical view of all the facts and circumstances surrounding the speech and the employment relationship. Id. at 1961 ("The proper inquiry is a practical one.").

---

[5]  In Williams, an athletic director wrote memoranda to an office manager and principal alleging financial improprieties regarding certain athletic accounts. The school district conceded that the athletic director was not required to write letters to the principal concerning athletic accounts.  After noting that the speech in the memoranda focused on the athletic director's daily operations, the Fifth Circuit stated:

> Simply because Williams wrote memoranda, which were not demanded of him, does not mean he was not acting within the course of performing his job.  He needed account information so that he could properly execute his duties as Athletic Director, namely, taking the students to tournaments and paying their entry fees.  The memoranda were not written from Williams's perspective as a "father" and "taxpayer."

Williams, 480 F.3d at 694.  We agree with the Fifth Circuit's interpretation and application of Garcetti.

- 14 -

Pursuant to their contracts, Plaintiffs were all hired as school teachers. By entering into the contracts, Plaintiffs agreed to "support the philosophy and curriculum of the Academy without reservation." Aplt. App. at 1359. Plaintiffs also agreed that their duties and responsibilities would be "consistent with the Charter Contract and Charter Application as approved by the District Board of Education." Id. Although the record indicates that Plaintiffs were encouraged to present their views to improve the Academy and did so in the form of complaints and grievances to the Board, we cannot deem such a generalized grievance policy to be an official duty without eviscerating Garcetti and the general constitutional principle that "public employees do not surrender all their First Amendment rights by reason of their employment." Garcetti, 126 S. Ct. at 1957; see id. at 1961 ("We reject . . . the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions.").

Nearly all of the matters Plaintiffs claim they discussed were made pursuant to their duties as teachers.[6] For example, Plaintiffs allege that they discussed the Academy's expectations regarding student behavior. Aplt. App. at 823. Ostensibly, as teachers, Plaintiffs were expected to regulate the behavior of

---

[6] There are twenty-nine such matters listed in Plaintiffs' brief and forty-four such matters listed in Defendants' brief. We have considered all of these matters, along with the parties' corresponding citations to Plaintiffs' deposition testimony. Aside from the twelve matters listed below, all of the remaining matters were either unsupported in the record or were clearly made pursuant to Plaintiffs' duties as teachers. Consequently the vast majority of the matters discussed fail to pass the first step of the Garcetti/Pickering analysis.

- 15 -

their students.  Likewise Plaintiffs discussed the Academy's curriculum and pedagogy.  Id. at 822, 957.  Of course, as teachers, Plaintiffs were paid to execute the Academy's curriculum and utilize an effective pedagogy.  Plaintiffs also complained that the Academy should spend more money on instructional aids, furniture, and classroom computers.  Id. at 903.  These complaints were made pursuant to Plaintiffs' inherent duty as teachers to ensure they had adequate materials to educate their students.  Consequently, statements regarding all of these and similar matters were made pursuant to Plaintiffs' official duties and could be freely regulated by the Academy.[7]

Nevertheless, viewing the evidence in the light most favorable to the them, Plaintiffs' speech regarding some of the matters was not made pursuant to their official duties.  These matters are: (1) the resignations of other teachers, (2) whether the Academy Code of Conduct could restrict Plaintiffs' freedom of speech, (3) staffing levels, (4) the Academy's spending on teacher salaries and bonuses, (5) criticisms of the school board, (6) the visibility of Dr. Marlatt and the Board at important events, (7) the lack of support, trust, feedback and communication with Dr. Marlatt, (8) Dr. Marlatt's restrictions on speech and association, (9) the treatment of parents by the Board, (10) Dr. Marlatt's favoritism, (11) whether the Academy charter would be renewed, and (12) the

---

[7] The district court's opinion and order was issued prior to Garcetti. Consequently, it did not analyze the matters discussed to determine whether they were related to Plaintiffs' employment duties.

upcoming Board elections. As teachers, Plaintiffs had no supervisory responsibility and no duty to report with regard to any of the problems being discussed, nor does it appear that Plaintiffs' discussion of these matters occurred during the performance of their official duties because the discussions occurred after hours and outside of the Academy. Furthermore, the discussions included ordinary citizens and parents who were not employed by the Academy. Consequently, these twelve matters discussed by Plaintiffs pass the first step of the Garcetti/Pickering analysis.

### 2.    Matters of Public Concern

Matters of public concern are "those of interest to the community, whether for social, political, or other reasons." Lighton v. Univ. of Utah, 209 F.3d 1213, 1224 (10th Cir. 2000). In determining whether speech pertains to a matter of public concern, the court may consider "the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest." Id. Statements revealing official impropriety usually involve matters of public concern. Id. Conversely, speech that simply airs "grievances of a purely personal nature" typically does not involve matters of public concern. Id. at 1225. In deciding what is a matter of public concern, we are required to consider "the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983).

Courts have held that political speech regarding a public election is undoubtedly a matter of public concern. See Bass v. Richards, 308 F.3d 1081, 1089 (10th Cir. 2002) (holding that speech relating to the viability of a potential candidate and the merits of candidates for office "is at the core of protected speech"). In contrast, we have held that the following are not matters of public concern: speech regarding grievances about internal departmental affairs, Hom v. Squire, 81 F.3d 969, 974 (10th Cir. 1996), disputes over the term of employment, Lancaster v. Indep. Sch. Dist. No. 5, 149 F.3d 1228, 1233-34 (10th Cir. 1998), and workplace frustration, McEvoy v. Showmaker, 882 F.2d 463, 466 (10th Cir. 1989).

In some cases, a pattern of speech may be considered as a unitary whole for determining whether it addresses matters of public concern. Johnsen v. Indep. Sch. Dist. No. 3, 891 F.2d 1485, 1491 (10th Cir. 1989). The determination of whether such a unitary analysis is appropriate is "fact sensitive and depends on how interrelated are the different aspects of the speech." Id. at 1492. Relevant factors include "the time frame in which the speech occurred, the different audiences to which the speech may have been directed, the continuity of the speech, and the degree to which the different aspects of speech built upon each other to create a cumulative impact on the state employer." Id. We have indicated that it is appropriate to conduct such a unitary analysis when "the speech involves one instance but multiple distinct subjects or the speech involves

multiple instances but only one subject." Id. Here, such a unitary analysis is inappropriate because Plaintiffs' speech involved multiple instances and multiple, unrelated subjects. Consequently, we must analyze separately each of the twelve matters that passed the first step of the Garcetti/Pickering analysis to determine whether they constitute matters of public concern.

Eight of the matters are clearly not matters of public concern because they are "internal in scope and personal in nature." Bunger v. Univ. of Okla., 95 F.3d 987, 992 (10th Cir. 1996); see also Lighton, 209 F.3d at 1225. These matters are: (1) the resignations of other teachers, (2) staffing levels, (3) Academy spending on teacher salaries and bonuses, (4) criticisms of the Board, (5) the visibility of Dr. Marlatt and the Board at important Academy events, (6) the lack of support, trust, feedback, and communication with Dr. Marlatt, (7) Dr. Marlatt's favoritism, and (8) the treatment of parents by the Board.

From our review of the record, it is clear that Plaintiffs' discussion of the resignations of other teachers relates to how Dr. Marlatt and the Board handled those resignations. See Aplt. App. at 1040. These comments reflect Plaintiffs' dissatisfaction with their supervisors' performance and are not matters of public concern. See Salge v. Edna Indep. Sch. Dist., 411 F.3d 178, 188 (5th Cir. 2005) (noting that criticisms of a "supervisors' job performance" are typically not matters of public concern). Plaintiffs' complaints about staffing levels, including a lack of aides, inherently relate to the amount of work Plaintiffs had to perform

individually, and so they are matters of personal, rather than public concern. Plaintiffs' complaints about their own salaries and bonuses are similarly matters of personal concern. See Kurtz v. Vickrey, 855 F.2d 723, 729 (11th Cir. 1988). Plaintiffs' complaints about the Board's apparent support for Dr. Marlatt, Dr. Marlatt and the Board's absence from important events, and Dr. Marlatt's lack of support, trust, feedback, and communication, and her alleged favoritism, all constitute complaints about a superior's job performance or management style. They do not address matters of public concern.

Plaintiffs' discussion regarding the treatment of parents by the Board concerns two aspects. Plaintiffs apparently enlisted the aid of some parents who complained to the Board about how Plaintiffs were disgruntled. See Aplt. App. at 719. Plaintiffs also expressed concern that the Board did not defer to the majority of parents (and apparently Plaintiffs as well) who opposed reverting to a self-contained classroom for the sixth grade. Id. at 719, 723. After reviewing the entire record, it is apparent that Plaintiffs' discussion regarding the Board's treatment of the parents is inherently related to Plaintiffs' personal complaints and is not a matter of public concern.

However, four remaining matters discussed by Plaintiffs are matters of public concern. These matters include: (1) whether the Academy's code of conduct could restrict Plaintiffs' freedom of speech, (2) Dr. Marlatt's restrictions on speech and association, (3) whether the Academy charter would be renewed,

and (4) the upcoming Board elections. Speech concerning potential illegal conduct by government officials is inherently a matter of public concern. See Sexton v. Martin, 210 F.3d 905, 910 (8th Cir. 2000). Consequently, whether the Academy's code of conduct could legally limit Plaintiffs' freedom of speech and whether Dr. Marlatt's attempts to do so violated the First Amendment are clearly matters of public concern. Furthermore, the prospect that the Academy's charter might not be renewed is of public concern, particularly to the Academy community. Finally, Plaintiffs' political speech regarding upcoming Board elections is undoubtedly a matter of public concern. See Bass, 308 F.3d at 1089; Cragg, 143 F.3d at 1346. Consequently, we continue with the Garcetti/Pickering analysis, but only with regard to the four remaining matters.

### 3.     The Balancing of Interests

"[T]here is no easy formula for 'weighing' an employee's First Amendment speech against an employer's interest in an efficient and disciplined work environment." Casey, 473 F.3d at 1333. Nevertheless, the question is whether the employer "has an efficiency interest which would justify it in restricting the particular speech at issue." Cragg, 143 F.3d at 1346. "In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." Rankin v. McPherson, 483 U.S. 378, 388 (1987). Pertinent considerations include "whether the statement impairs discipline by superiors or

harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Id. Arguably, "the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, by the speech itself, of the public employer's internal operations and employment relationships." Flanagan v. Munger, 890 F.2d 1557, 1566 (10th Cir. 1989).

In its opinion and order, the district court stated: "Moreover, the Teachers have presented no evidence to prove . . . that the employee's interest in engaging in the speech outweighed the employer's interest . . . ." Brammer-Hoelter, 2006 WL 827410, at *5 n.4. Apparently, this statement is premised on an error of law, as the employer bears the burden of justifying its regulation of the employee's speech. See Connick, 461 U.S. at 150. Defendants made no argument regarding their interest as employers either in their motion for summary judgment or in their appellate brief. Accordingly, we cannot affirm summary judgment on this basis and must assume that Plaintiffs' interests in speaking on the four remaining matters outweighed Defendants' interests in managing the work environment. See Tran v. Tr. of State Colleges in Colo., 355 F.3d 1263, 1266 (10th Cir. 2004) ("Issues not raised in the opening brief are deemed abandoned or waived.").

### 4. Substantial Factor in Motivating An Adverse Employment Action

Plaintiffs bear the burden of showing that their speech on the four remaining matters was a motivating factor in an adverse employment action. See Cragg, 143 F.3d at 1346. First Amendment retaliation claims do not depend on a property interest in continued employment. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-84 (1977) (noting that a plaintiff's First Amendment retaliation claims are not defeated "[e]ven though he could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire him"). Consequently, we have stated that "[a]ctions short of an actual or constructive employment decision can in certain circumstances violate the First Amendment." Morfin v. Albuquerque Pub. Schs., 906 F.2d 1434, 1437 n.3 (10th Cir. 1990). Although we have never established a general rule for determining what adverse employment actions may suffice, we have noted that "'promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees.'" Schuler v. City of Boulder, 189 F.3d 1304, 1309 (10th Cir. 1999) (quoting Rutan v. Republican Party of Ill., 497 U.S. 62, 75 (1990)). Indeed, in Morfin, we implied that "substantial harassment and abuse" could be a sufficient adverse employment action for First Amendment purposes. See 906 F.2d at 1437; see also Schuler, 189 F.3d at 1309 (analyzing Morfin). We

have also held that First Amendment retaliation claims can be based on removing job duties from an employee's portfolio or giving an employee a written reprimand or a poor performance rating. Id. at 1310; see also Baca v. Sklar, 398 F.3d 1210, 1220-21 (10th Cir. 2005) (noting that a First Amendment retaliation claim may be based on "repercussions that would not be actionable under Title VII").

In this case, viewing the evidence in the light most favorable to Plaintiffs, there is sufficient evidence to support the finding of an adverse employment action resulting from Plaintiffs' speech and association. For example, Plaintiffs contend that they received poor performance evaluations (that differed materially from their prior evaluations) during the period in which they exercised their First Amendment rights. See Aplt. App. at 1334-57. They contend that their actual performance did not change and that the decline was due to the result of "gossiping." See Aplt. Br. at 14-15 (citing multiple parts of the record). It also appears that Dr. Marlatt imposed increasingly strict prohibitions on speaking outside of school as a result of Plaintiffs' speech. For example, Dr. Marlatt eventually forbade Plaintiffs to speak with parents about school matters. Id. Additionally, Plaintiffs testified that they were ignored by Dr. Marlatt and that Dr. Marlatt treated them with a "hostile demeanor, slamming doors and chairs." Id. at 16. Finally, Plaintiffs suggest that they were blacklisted from future employment at the Academy because of their speech. Id. at 54-55.

- 24 -

While a supervisor's surly attitude would probably not deter a reasonable person from exercising his or her First Amendment rights, it is clear that poor performance ratings certainly could, especially for non-tenured teachers. Additionally, increased restrictions on protected speech and association and blacklisting are also sufficient to satisfy the standard. Based on the facts before us, there is enough evidence to create a genuine dispute about whether these adverse actions occurred and whether they were motivated by Plaintiffs' speech and association. Accordingly, summary judgment for Defendants on this ground is improper.

### 5. Alternative Reason for the Adverse Employment Action

If a plaintiff establishes that protected speech was a motivating factor in an adverse employment action, an employer may nonetheless "demonstrate that it would have taken the same action against the employee even in the absence of the protected speech." Lybrook, 232 F.3d at 1338-39. Here, Defendants have not proffered an alternative reason for their actions against Plaintiffs, much less brought forth evidence sufficient to prove by a preponderance that they were in fact motivated by such an alternative reason. Therefore, this step of the analysis is not a proper basis for summary judgment in favor of the Defendants. See Cragg, 143 F.3d at 1347. Accordingly, contrary to the holding of the district court, Plaintiffs' free speech retaliation claim survives summary judgment at this point, but only with regard to the four specified remaining matters.

## B.     Freedom of Association Retaliation Claim

Plaintiffs also raise a separate freedom of association retaliation claim, arguing that they suffered adverse employment actions for meeting with one another. See Dickeson, 844 F.2d at 1440. The district court failed to discuss this claim in its opinion and order. While we would typically remand the claim, we note that Plaintiffs were clearly associating for the purpose of discussing the very speech that supports their freedom of speech retaliation claim, some of which addresses matters of public concern. Thus, although the freedom of speech and freedom of association retaliation claims remain independent, their analysis is effectively indistinguishable. Accordingly, Plaintiffs' freedom of association retaliation claim survives summary judgment to the same extent as does their free speech retaliation claim.

## C.     Prior Restraint Claim

Plaintiffs raise a prior restraint claim that is separate and distinct from their freedom of speech and freedom of association retaliation theories. Arndt v. Koby, 309 F.3d 1247, 1251 (10th Cir. 2002). "[U]nlike an adverse action taken in response to actual speech, [a prior restraint] chills potential speech before it happens." Id. (quoting United States v. Nat'l Treasury Employees Union ("NTEU"), 513 U.S. 454, 468 (1995)). The district court failed to address Plaintiffs' prior restraint claim in its opinion and order. Accordingly, we remand this matter to the district court for a determination under NTEU and our related

precedent.

## III. The Due Process Claims

Plaintiffs also assert that they were constructively discharged or fired as a result of their speech in violation of their procedural due process rights under the Fourteenth Amendment. "To assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." Montgomery v. City of Ardmore, 365 F.3d 926, 935 (10th Cir. 2004). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (internal quotations marks omitted). For this reason, a hearing is generally required before a person may be deprived of a protected interest. Smith v. Org. of Foster Families for Equal. & Reform, 431 U.S. 816, 848 (1977).

In general, we look to state law to determine whether a property interest in employment exists. Lighton, 209 F.3d at 1221. Such an interest can arise from "state statutes, regulations, municipal ordinances, university rules, and even express or implied contracts." Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 536 (10th Cir. 1995). Here, the district court assumed that Plaintiffs had a continued interest in employment based on ambiguous language in their employment contracts. It held, however, that Plaintiffs voluntarily resigned their

positions and thus could not show a constructive discharge.

Absent some specific enactment to the contrary, an "at-will" employee has no property right in continued employment under Colorado law. See Cont'l Air Lines, Inc. v. Keenan, 731 P.2d 708, 711-12 (Colo. 1987); Holland v. Bd. of County Comm'rs, 883 P.2d 500, 505 (Colo. Ct. App. 1994). Each Plaintiff signed a one-year employment contract. The contracts are arguably ambiguous as to whether Plaintiffs are "at-will" employees. For example, the contracts state: "The Teacher shall serve under a renewable year-to-year contract." Aplt. App. at 1359. The contracts also state: "Notwithstanding the Effective Period of this agreement, the Teacher may be terminated by the Academy Board, provided just cause is given." Id. (emphasis added). Yet, the contracts contain a contrary provision stating that: "The Teacher is considered an at-will employee in the sense that this agreement may be terminated at any time by either of the Parties, provided that a minimum of two (2) week's [sic] written notice is given." Id. at 1362.

However, Defendants point to a particular clause in the contracts that they argue is decisive. The clause reads:

> In [the] event any provision of this agreement is later discovered to be incompatible with one or more provisions of the Charter Contract or any District policy which has not been waived, that provision shall be null and void.

Id. The charter contract states that the Academy "shall not have the authority, by virtue of its policies or procedures or other action of the Academy Board to

- 28 -

change the 'at-will' nature of the employment relationship." Id. at 294.

Consequently, Defendants argue that if any provision in Plaintiffs' contracts altered the "at-will" relationship, such a provision is void.

In Colorado, a "government entity's power to enter into contractual obligations is circumscribed by statute and ordinances." Kirkland v. St. Vrain Valley Sch. Dist. No. Re-1J, 464 F.3d 1182, 1190 (10th Cir. 2006). Such restrictions are incorporated into any contract the government entity makes. Id. Thus, any party contracting with a government entity is charged with constructive knowledge of those restrictions and cannot claim justifiable reliance on statements to the contrary. Id.; see also Keeling v. City of Grand Junction, 689 P.2d 679, 680 (Colo. Ct. App. 1984) (imparting constructive knowledge that a city council could only act pursuant to the authority granted to it by the city's charter). We have applied this rule in a case concerning a school district policy requiring school board approval of certain expenditures. See Kirkland, 464 F.3d at 1190 (holding that the school district could not be bound by an administrator's promise to buy-out an employee's salary). Thus, because the charter contract in this case clearly states that the Academy cannot alter the at-will employment relationship, the clause cited by Defendants removes any ambiguity–Plaintiffs were at-will employees, and they had no property right in continued employment. See Cont'l Airlines, 731 P.2d at 711-12. Consequently, they cannot sustain a procedural due process claim based on constructive discharge or termination.

Plaintiffs also allege that their procedural due process rights were violated when the Academy failed to process their grievance claims filed on March 12. This claim fails because the Academy's grievance policy itself did not create a property interest. See Wells v. Hico Indep. Sch. Dist., 736 F.2d 243, 254 (5th Cir. 1984) (noting that a general grievance policy does not create a property interest because it "allows a means for employees . . . to voice their complaints [but] says nothing about either discharge or nonrenewal"), cert. dismissed, 473 U.S. 901 (1985).

**IV.    Breach of Contract and Estoppel Claims**

Plaintiffs assert pendent state law causes of action for breach of contract and promissory estoppel. They argue that their employment contracts and promises made by the Academy gave them a right to rescind their resignations and that the failure of the Board to accept those rescisions was a breach of their contracts. The district court rejected these claims after it determined Plaintiffs' resignations were effective upon receipt by the Board.

On this point, Plaintiffs' employment contracts are unambiguous. The contacts state "this agreement may be terminated at any time by either of the Parties, provided that a minimum of two (2) week's [sic] written notice is given," Aplt. App. at 1362, which clearly indicates that the right to terminate is a unilateral one, not requiring acceptance. Indeed, Plaintiffs' resignation letters were dated March 1, 1999, and all stated that their final day of work would be

March 12, 1999, exactly ten working days (or two work weeks) in the future. Two of the letters even noted that the March 12 end date was "in accordance with the terms of my contract," id. at 351, 357, and a third stated "[i]n accordance with my contract, it is my intention to continue teaching for two weeks," id. at 356. Consequently, the Academy was not required to accept Plaintiffs' resignations to make them effective, nor was the Academy required, as a matter of contract, to accept Plaintiffs' attempts to rescind their contracts.[8]

Plaintiffs nonetheless claim that, pursuant to its course of dealing, the Academy had established that resignations were not effective until acted upon by the Board. However it is "[o]nly where the terms of an agreement are ambiguous or are used in some special or technical sense not apparent from the contractual document itself that the court may look beyond the four corners of the agreement in order to determine the meaning intended by the parties." Pepcol Mfg. Co. v. Denver Union Corp., 687 P.2d 1310, 1314 (Colo. 1984). Consequently, if the relevant contract provision is unambiguous, the course of dealing may not override the document's plain meaning. See Richard A. Lord, Williston on Contracts § 34:7 (4th ed. 1990) ("[C]ustom can only supply incidents to a contract where the contract is ambiguous on the point to which the party seeks to apply the

---

[8] Indeed, given that Plaintiffs were at-will employees, it makes no sense that the Academy would have a contractual obligation to accept Plaintiffs' attempts to rescind their resignations when the Academy could terminate Plaintiffs unilaterally.

custom."). Here, the contracts unambiguously state that Plaintiffs had the unilateral power to terminate their contract provided two-weeks' notice was given. Evidence of the Academy's course of dealing may not be used to contradict this unambiguous term.

Plaintiffs also claim breach of contract and estoppel based on the Academy's failure to process their March 12 grievance complaints in a timely manner. Because Plaintiffs voluntarily resigned their positions, and the internal grievance procedure was aimed at addressing the grievances of employees, these claims are moot. See Comm. for First Amendment v. Campbell, 962 F.2d 1517, 1524 (10th Cir. 1992) (noting that a claim becomes moot "when no reasonable expectation exists that the alleged violation will recur and interim . . . events have eliminated the effects of the alleged violation"). In any event, Plaintiffs' grievances were processed and denied in writing by the Board on May 18, 1999. See Aplt. App. at 368.

V.    The Academy's Liability Based on Policy or Custom

The Academy argued below that it should not be liable under § 1983 because there was no institutional policy or custom depriving Plaintiffs of their rights. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). It is true that § 1983 liability for an entity cannot be predicated on respondeat superior. See City of Canton v. Harris, 489 U.S. 378, 385 (1989). Instead, it is necessary to show a direct causal link between the acts of the entity and the alleged

constitutional deprivation(s). Ware v. Unified Sch. Dist. No. 492, 881 F.2d 906, 912-13 (10th Cir. 1989). Under appropriate circumstances, a single decision by policymakers can be sufficient to create liability under § 1983. Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). In its opinion and order, the district court never addressed the Academy's argument regarding the lack of a policy or custom, and the Academy is free to reassert it on remand.

## VI.    Dr. Marlatt's Qualified Immunity

In Defendants' motion for summary judgment, Dr. Marlatt asserted a qualified immunity defense. The district court did not address this argument in its opinion and order, and Dr. Marlatt did not cross-appeal. Once a defendant raises a qualified immunity defense, the plaintiff must show: "(1) that the defendant's actions violated a constitutional or statutory right, and (2) that the rights alleged to be violated were clearly established at the time of the conduct at issue." Anderson v. Blake, 469 F.3d 910, 913 (10th Cir. 2006) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). As already discussed, Plaintiffs have shown that a jury could find that Dr. Marlatt violated their constitutional rights under the First Amendment by retaliating against them for exercising their freedom of speech and association. Conversely, Plaintiffs have failed to show that Dr. Marlatt violated their procedural due process rights under the Fourteenth Amendment. On remand, the district court should consider these holdings (and how we have refined the surviving claims) in addressing Dr. Marlatt's motion for

qualified immunity.

## VII.  The District's Motion for Summary Judgment

The district court dismissed the District's motion for summary judgment as moot based on its determination that Plaintiffs' claims failed on the merits.  As we have decided otherwise, the District is free to reassert this motion on remand.

We AFFIRM the district court's grant of summary judgment on the procedural due process, contract, and estoppel claims.  We REVERSE in part its grant of summary judgment on the freedom of speech and freedom of association retaliation claims.  We REMAND the prior restraint claim for further proceedings consistent with this opinion.  On remand, Defendants are free to assert those defenses not addressed by the district court in its opinion and order as well as any additional defenses that may exist.