**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 21, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

TAISSIYA OLEYNIKOVA,

       Plaintiff - Appellant,

v.

REGGIE BICHA, GALINA KRIVORUK,
RONALD OZGA,

       Defendants - Appellees.

No. 11-1017
(D.C. No. 1:09-CV-01019-PAB-KMT)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE,** Chief Judge, **TYMKOVICH**, Circuit Judge, and **EAGAN**,[**]
Chief District Judge.

---

    This appeal arises from a 42 U.S.C. § 1983 action for damages brought by

Appellant Taissiya Oleynikova, an employee of the State of Colorado,

Department of Human Services (DHS) Office of Information Technology Services

(OITS), against Appellees Reggie Bicha, Executive Director of DHS, in his

official capacity, and Galina Krivoruk and Ronald Ozga, employees of DHS, in

their individual capacities. At issue is whether the district court properly granted

---

    [*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

    [**]The Honorable Claire V. Eagan, Chief Judge of the United States District
Court for the Northern District of Oklahoma, sitting by designation.

summary judgment to Appellees on Plaintiff's § 1983 complaint, which alleges that Plaintiff was retaliated against in violation of the First Amendment of the United States Constitution. We exercise our jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.    BACKGROUND

Plaintiff has been employed by OITS since 1999 and her current position is classified as an "Information Technology Professional - I." Plaintiff is part of the "Trails" group of OITS, which provides information technology support for Colorado's child welfare services. From approximately 2005 through 2007, Plaintiff's chain of supervision included her immediate supervisor Chuck Chow, Krivoruk, now an Applications Director, Ozga, the Deputy Chief Information Officer, and Ronald Huston, the Chief Information Officer. Plaintiff worked closely with Chow and the two of them shared an office during much of the relevant time period. Krivoruk and Plaintiff had known each other prior to Plaintiff's employment at DHS, and Krivoruk had been instrumental in helping Plaintiff get the job. During 2005, a dispute arose within the Trails group regarding an outside contractor, Meggin Bennabhaktula. Plaintiff's statements in relation to this dispute form the basis of this litigation.

Bennabhaktula was hired as an outside contractor by OITS in 2005 to design and implement software for the Trails team. Bennabhaktula's work was supervised by Krivoruk, but Bennabhaktula worked with Chow to a certain extent.

-2-

Around March 2005, Bennabhaktula complained to Krivoruk that Chow and Plaintiff were not cooperating with her and that Chow was "sabotaging" her. R. Vol. 1 at 197. Krivoruk discussed the matter with Chow on April 4, 2005, at which time Chow stated that Bennabhaktula was lying, had not been coming to work, was not communicating with him regularly, and had missed deadlines. The next day, Krivoruk held a meeting with Chow and Bennabhaktula. Krivoruk stated that the meeting was "emotional on both sides" and it was decided that Krivoruk would supervise the day-to-day activities of Bennabhaktula's project. *Id*. at 205. After this meeting, Chow went to Ozga and stated that he believed Bennabhaktula should be fired. Chow then unilaterally blocked Bennabhaktula's access to the computer system because he believed she was a security risk. Shortly thereafter, Krivoruk and Chow had at least two heated exchanges in which Krivoruk told Chow to restore Bennabhaktula's access. Chow stated that Krivoruk screamed at him and threatened to suspend him. Krivoruk stated that Chow raised his voice, stood uncomfortably close to her, and said that he would "show [her] who's the boss here." *Id.* at 208.

After these exchanges, Krivoruk telephoned Plaintiff to discuss the situation. Krivoruk stated that she called Plaintiff because she was frightened and wanted to be comforted. Krivoruk told Plaintiff about the dispute and said that Chow had threatened her. Plaintiff stated that she was surprised and did not believe Chow would threaten Krivoruk. Plaintiff further stated that she agreed

with Chow that Bennabhaktula was not performing her duties and that it was a waste of taxpayer money to continue to pay her.[1]

On April 25, 2005, Plaintiff emailed Krivoruk, stating that she felt "insulted" by Bennabhaktula because Bennabhaktula had accused her of lying. *Id.* at 268. Plaintiff wrote that "[i]t hurts my feelings badly . . . . It would be nice of [Bennabhaktula] if she calls me or e-mails me saying that she was sorry and did not want to hurt my feelings . . . . [as in original] Otherwise I will think of [Bennabhaktula] as of a dishornest [sic] person with no dignity." *Id.* Sometime after this email, Plaintiff met with Krivoruk to discuss the situation. Plaintiff's recollection of the meeting is that she stated that she did not want to get human resources involved, but just wanted an apology from Bennabhaktula.

Over the next few months, Plaintiff began seeking a promotion within her department. Plaintiff alleges that Krivoruk and Ozga repeatedly thwarted her efforts to receive a promotion and/or refused to grant her a promotion, in retaliation for Plaintiff's statements regarding Bennabhaktula. In July 2005, Plaintiff emailed Huston, stating that she was being "denied advancement." *Id.* at 283. Plaintiff's email does not explicitly allege retaliation nor does it mention any concerns regarding use of taxpayer money. As a result of Plaintiff's email, a

_____

[1] Krivoruk disputes that Plaintiff made these statements about Bennabhaktula during this telephone call. Construing the evidence in the light most favorable to the non-moving party, we will presume that Plaintiff made these statements at that time.

-4-

meeting took place in October 2005 among Plaintiff, Chow, Krivoruk, Ozga, and Huston to discuss Plaintiff's concerns. At this meeting, Plaintiff reiterated her opinion that employing Bennabhaktula was a waste of taxpayer money. Plaintiff also stated that she believed Krivoruk was retaliating against her because Plaintiff had not taken Krivoruk's side in the dispute over the contractor.

In March 2006, Plaintiff filed a complaint of retaliation with the DHS Employment Affairs Division Civil Rights Unit. The remedy requested by Plaintiff in that complaint was "to be compensated for my financial and moral losses." R. Vol. 2 at 363. In April 2006, Plaintiff sent an email to Huston raising concerns about her performance evaluation. In response, Huston held a meeting with Plaintiff, Krivoruk, and Ozga. At this meeting, Plaintiff stated that she believed the process by which comments were being collected for her evaluation was improper and that this process was part of the retaliation against her for taking Chow's side in the dispute regarding Bennabhaktula. Plaintiff reiterated her opinion that hiring Bennabhaktula was a waste of public money. Huston met with Plaintiff individually in May 2006, at which time Plaintiff discussed her concerns about her promotion, mentioned other perceived irregularities in Krivoruk's management of personnel, and again stated that she believed she was being retaliated against for taking Chow's side in the earlier dispute. In August 2006, Plaintiff sent an email to Huston asking for an update on the status of her complaints regarding her promotion and the alleged retaliation by Krivoruk and

Ozga.

In January 2007, Plaintiff sent a lengthy email to Karen Beye, the newly appointed Executive Director of DHS, summarizing her complaints from the previous two years about retaliation and lack of promotion. In February 2007, Plaintiff complained to her new supervisor, Van Head, and team leader, Bruce Rensel, that she was being retaliated against for the prior statements regarding Bennabhaktula. In March 2007, Plaintiff brought these same concerns to Richard Gonzales, the Executive Director of the Department of Personnel and Administration (DPA). Gonzales referred Plaintiff's case to a state personnel rules interpreter, who investigated. The investigation resulted in a finding that Plaintiff had not been treated "unfairly or improperly." *Id.* at 447. In May 2007, Plaintiff emailed Gonzales asking to meet with him "to discuss not only my personal issues but the issues that are of great concern to me as a taxpayer or just a Colorado resident." R. Vol. 3 at 1005. Plaintiff then met with Gonzales and reiterated her position that employing Bennabhaktula was a waste of public funds and again stated that she had been retaliated against for voicing that opinion.

In January 2008, Plaintiff sent a two-page email to Gonzales and others, in which Plaintiff again summarized her situation. Plaintiff wrote:

> I strongly believe that if I had not been caught in the middle of [Krivoruk's] fight with my ex-supervisor Chuck Chow, I would have been promoted . . . . [Krivoruk] and I were friends before the fight with [Chow] took place. If it were not for the bad

> atmosphere followed [sic] that fight, nobody would have
> ever questioned whether my performance or tasks were
> qualified for [a promotion].

R. Vol. 2 at 413. Following this meeting, a DPA consulting services supervisor continued to investigate Plaintiff's situation. In March 2008, the DPA supervisor emailed Plaintiff stating that there did not appear to be any irregularity in her job evaluations or lack of promotion and informed Plaintiff of formal grievance procedures. On April 21, 2008, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission, alleging age discrimination and retaliation. Plaintiff filed a whistleblower complaint with the state personnel board on July 2, 2008.

The complaint in this case was filed on May 1, 2009, alleging that Defendants discriminated against Plaintiff based on her age and that Defendants retaliated against Plaintiff in violation of her First Amendment right to freedom of speech. The district court granted summary judgment to Defendants on both claims. Plaintiff now appeals the district court's ruling on the retaliation claim only.

## II.    ANALYSIS

We review a district court's grant of summary judgment *de novo*, applying the same standard as the district court. *Hackworth v. Progressive Cas. Ins. Co.*, 468 F.3d 722, 725 (10th Cir. 2006), *cert. denied*, 550 U.S. 969 (2007). Summary judgment is proper only if the movant shows "that there is no genuine dispute as

to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Furthermore, because this case involves the First Amendment, we have "an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Citizens for Peace in Space v. City of Colo. Springs*, 477 F.3d 1212, 1219 (10th Cir. 2007).

Plaintiff alleges that she was denied promotion in retaliation for speaking out against her department's employment of Bennabhaktula. "[T]he First Amendment bars retaliation for protected speech." *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998). "[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983). "Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). However, the interests of public employees in commenting on matters of public concern must be balanced with the employer's interests "in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *see also Garcetti*, 547 U.S. at 420 ("The Court's decisions, then, have sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of

government employers attempting to perform their important public functions.").

The Court in *Pickering* sought to achieve this balance through the adoption of a four-part test to be implemented in public-employee, free-speech cases. *See Kent v. Martin*, 252 F.3d 1141, 1143 (10th Cir. 2001) (describing *Pickering* test). In *Garcetti*, the Court expanded on the *Pickering* test by adding a fifth, threshold inquiry that seeks to determine whether the speech at issue was made pursuant to the public employee's official duties. *Garcetti*, 547 U.S. at 421. Thus, after *Garcetti*, "it is apparent that the '*Pickering*' analysis of freedom of speech retaliation claims is a five step inquiry which we now refer to as the '*Garcetti/Pickering*' analysis." *Brammer–Hoelter*, 492 F.3d at 1202; *see also Couch v. Bd. of Trs. of the Mem'l Hosp.*, 587 F.3d 1223, 1235 (10th Cir. 2009) ("When analyzing a free speech claim based on retaliation by an employer, this court applies the five-prong *Garcetti/Pickering* test.").

The *Garcetti/Pickering* test includes the following inquiries:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009). The instant appeal

concerns only the second prong of this test:  whether Plaintiff's speech was on a matter of public concern.  Speech that is of no public concern is not protected and the inquiry ends.

Whether Plaintiff's statement was on a matter of public concern is a question of law.  *Baca v. Sklar*, 398 F.3d 1210, 1219 (10th Cir. 2005).  "Matters of public concern are those which can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'"  *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996) (quoting *Connick*, 461 U.S. at 146).  "Statements revealing official impropriety usually involve matters of public concern.  Conversely, speech that simply airs grievances of a purely personal nature typically does not involve matters of public concern."  *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007) (internal citations and quotations omitted).  "It is not sufficient that the topic of the speech be of general interest to the public; in addition, what is actually said must meet the public concern threshold."  *Burns v. Bd. of Cnty. Comm'rs*, 330 F.3d 1275, 1286 (10th Cir. 2003) (internal quotation omitted).

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  *Connick*, 461 U.S. at 147-48.  In addition, we may consider the "motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the

-10-

public's interest." *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000).

Applying this standard, the district court held that Plaintiff's speech concerning Bennabhaktula was not a matter of public concern because the "context reveals plaintiff's motive in making it was not that of a concerned citizen," but instead that Plaintiff sought to "redress her personal grievance and defend her supervisor." R. Vol. 4 at 12-13. Plaintiff argues that the district court erred in not finding that her speech inherently involved a matter of public concern because it dealt with the alleged waste of public funds. Plaintiff also argues that the district court erred by considering all of her speech as a unitary whole and by improperly focusing on plaintiff's motive in making the speech.

Plaintiff, citing *Brammer-Hoelter*, argues that the district court erred in considering all of Plaintiff's speech as a whole rather than separately considering each incidence of speech. However, Plaintiff appears to have misunderstood our holding in *Brammer-Hoelter*. In *Brammer-Hoelter*, we stated that "in some cases, a pattern of speech may be considered as a unitary whole for determining whether it addresses matters of public concern. . . . [I]t is appropriate to conduct such a unitary analysis when . . . the speech involves multiple instances but only one subject." *Brammer-Hoelter*, 492 F.3d at 1205 (internal quotations omitted). In the present case, all of Plaintiff's speech concerned her opinion that Bennabhaktula's employment was a waste of money and the alleged retaliation

-11-

against Plaintiff resulting from her expression of that opinion.  Thus, Plaintiff spoke on multiple occasions, but only on one subject.  Her speech should therefore be considered as a unitary whole. *Id.*

Plaintiff next argues that the district court erred by focusing on Plaintiff's motive rather than on the content of Plaintiff's speech.  Plaintiff states that "the content of the speech is the most important factor to be considered," and she cites cases from other jurisdictions in support.  However, this court's precedent does not support such a categorical proposition.  *See Schalk v. Gallemore*, 906 F.2d 491, 496 (10th Cir. 1990) (considering speaker's motive as well as content of speech); *Wulf v. City of Wichita*, 883 F.2d 842, 857 (10th Cir. 1989) (same).  In considering the content, form, and context of a plaintiff's speech, we have repeatedly held that a court may also consider the speaker's motive in making the speech.  *See, e.g., Brammer-Hoelter*, 492 F.3d at 1205; *Lighton*, 209 F.3d at 1224.  However, we have never made the pronouncement that content could trump motive or *vice versa*.  Instead, the court must examine the entire record as a whole.  *See Connick*, 461 U.S. at 147-48.

It can be difficult to draw "the thin line between a public employee's speech which touches on matters of public concern, and speech from the same employee which only deals with personal employment matters . . . ." *Schalk v. Gallemore,* 906 F.2d 491, 495 (10th Cir. 1990).  As noted above, speech disclosing "any evidence of corruption, impropriety, or other malfeasance" on the

part of public officials will generally be of public concern. *Conaway v. Smith,* 853 F.2d 789, 796 (10th Cir. 1988). However, as the Supreme Court has recently reiterated, "[i]t is not a right to transform everyday employment disputes into matters for constitutional litigation in the federal courts." *Borough of Duryea v. Guarnieri*, -- U.S. --, 131 S. Ct. 2488, 180 L. Ed. 2d 408 (2011).

When an employee's speech raises concerns over the performance of another employee, "in one sense the public may always be interested in how government officers are performing their duties. But, as the *Connick* and *Pickering* test has evolved, that will not always suffice to show a matter of public concern." *Borough of Duryea*, 131 S. Ct. at 2501. We have repeatedly held that speech relating to internal personnel disputes is not of public concern, even where that speech may tangentially concern expenditure of public funds. *See*, *e.g.*, *Brammer-Hoelter*, 492 F.3d at 1206 (holding that plaintiffs' "dissatisfaction with their supervisors' performance [were] not matters of public concern"); *Lighton*, 209 F.3d at 1225 (holding that speech regarding alleged misuse of public equipment was not matter of public concern where plaintiff made statements "for his own personal reasons"); *see also Gardetto*, 100 F.3d at 813-14 ("the First Amendment protects neither public employee criticisms of internal management decisions, nor public employee complaints about the structure of purely internal administrative bodies") (internal quotations and citations omitted).

Having considered the content, context, and form of Plaintiff's speech, as

-13-

well as having considered her motives, we do not find that Plaintiff's speech is protected by the First Amendment. Plaintiff's initial statements regarding Bennabhaktula were made in the context of an interpersonal dispute between her immediate supervisor (Chow) and his supervisor (Krivoruk), both of whom were friendly with Plaintiff. Plaintiff has repeatedly characterized her situation as one where she was retaliated against for not "siding with" Krivoruk in this dispute. Plaintiff's statements have also demonstrated a personal dislike of Bennabhaktula and a desire for Bennabhaktula to apologize to Plaintiff for perceived insults. These circumstances strongly suggest that Plaintiff's continued statements regarding Bennabhaktula were made within the context of an intra-departmental personnel dispute and were motivated by a personal grievance. Such statements do not rise to the level of public concern. *See Connick*, 461 U.S. at 148 (holding that speech made as extension of ongoing internal dispute were not matter of public concern).

Plaintiff's attempt to characterize her statements as regarding a matter of public concern by invoking the "waste of public funds" is unsuccessful. Plaintiff's statements regarding the narrow issue of one contractor's job performance do not "sufficiently inform the issue as to be helpful to the public in evaluating the conduct of government." *Wilson v. City of Littleton*, 732 F.2d 765, 768 (10th Cir. 1984). Unlike many cases where courts find speech to be on matters of public concern, the conduct complained of by Plaintiff did not reveal a

-14-

potential "breach of public trust on the part of a public officer." *Conaway*, 853 F.2d at 796 (citing *Connick*, 461 U.S. at 148). Nor did Plaintiff's allegations have any relation to public health or safety, which would be of interest to the public. *See Considine v. Adams Cnty.*, 910 F.2d 695, 700 (10th Cir. 1990) (holding that statements alleging "numerous statutory and regulatory public health and safety violations" at public work sites were on matters of public concern); *Conaway*, 853 F.2d at 796 (holding that speech concerning "substandard electrical work, which, [plaintiff] felt, posed danger to public life, health, and safety" was on matters of public concern); *Wren v. Spurlock*, 798 F.2d 1313, 1317 (10th Cir. 1986) (holding that speech concerning sexual harassment of students and teachers at a public school were on matters of public concern). Finally, Plaintiff's repetition of her allegations over the years and her repeated explanation of the alleged retaliation were in the context of addressing her own career advancement and were not on a matter of public concern.

To characterize Plaintiff's speech in this case as a matter of public concern would allow any public employee's grievance with another public employee to rise to the level of a public concern whenever the phrase "waste of public resources" or similar language is contained in the speech. Because Plaintiff's statements were not on a matter of public concern, Defendants are entitled to summary judgment.

Therefore, we **AFFIRM** the judgment of the district court.


Entered for the Court


Claire V. Eagan
District Judge