FILED
**United States Court of Appeals**
**Tenth Circuit**

**May 5, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KEN PETERSON, an individual,

    Plaintiff - Appellant,

v.

RICHARD WILLIAMS, in his individual
and official capacities; DOAJO HICKS, in
his individual and official capacities;
MICHAEL LACOURSE, in his individual
and official capacities; LYNN JOSEPH, in
her individual and official capacities;
DIXIE STATE UNIVERSITY, a public
collect of the State of Utah; JOHN DOES
I-X, in their individual and official
capacities; ROE ENTITIES I-X,

    Defendants - Appellees.

--------------------------------------

FOUNDATION FOR INDIVIDUAL
RIGHTS IN EDUCATION,

    Amicus Curiae.

No. 20-4059
(D.C. No. 4:19-CV-00062-DB)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **MORITZ**, and **EID**, Circuit Judges.
_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

After being fired from Dixie State University ("DSU"), Plaintiff Ken Peterson

sued his former employer and several of its employees.  In his complaint, Peterson

alleged three causes of action pursuant to 42 U.S.C. § 1983, as well as two causes of

action under state law.  The defendants moved to dismiss Peterson's complaint, and

the district court granted the defendants' motion.  Peterson now appeals.  Exercising

jurisdiction under 28 U.S.C. § 1291, we affirm but remand for amendment of the

judgment.

## I.

### a.

Peterson was a music professor at DSU from 2002 to 2018.  He received

tenure in 2009.  As part of his employment, he instructed students "in the vocal arts"

and "in music," as well as assisted, "on an extracurricular basis, in the production and

staging of . . . musical performances."  App'x at 8.

In 2014, DSU fired one of its theater professors, Varlo Davenport, after a

student accused Davenport of injuring her during a classroom exercise.  Davenport

appealed his termination through a DSU appeals process, and Peterson testified on

Davenport's behalf.  The appeal was unsuccessful, and DSU's decision to terminate

Davenport was made final.

According to Peterson's complaint, "Peterson questioned the correctness of

Davenport's termination."  *Id.* at 9.  "Specifically, Peterson questioned whether the

chair of Davenport's department (Mark Houser) was competent in his leadership, and

whether the administration had acted in accordance with due process and good faith

2

in its termination of Davenport." *Id.* He "generally voiced his criticisms or concerns through in-person conversations with members of his community." *Id.* at 9. Peterson did so, he alleges, as "a concerned member of the Southern Utah community, alarmed at the potential that a state entity of considerable import in the community may have been failing that community." *Id.*

On March 2, 2018, Peterson received an initial termination letter, which suspended Peterson's pay and prohibited him from DSU property until a final determination was made. According to the letter, Peterson was being fired for "professional incompetence, serious misconduct, or unethical behavior, and serious violation of University rules and regulations." *Id.* at 124. The main theme of the allegations supporting Peterson's termination was Peterson's speech and conduct relating to Houser. The letter asserted the following:

> (1) Peterson wrongly "disclosed confidential information about . . . Houser's employment to unauthorized third persons, including information about Houser's tenure review process";
> (2) Peterson "improperly represented the Music [Department] in stating to a third person that the Music and Theatre Department wanted Houser 'terminated'";
> (3) Peterson wrongly "spoke on behalf of the Music Department telling a third person that the Music Department was refusing to work with the Theatre Department to produce musicals in retaliation for Houser recommending that Davenport be terminated";
> (4) Peterson "slandered . . . Houser when he told a third person that Houser is 'destroying' the Theatre Department, a direct impact on Houser's professional reputation";
> (5) Peterson "slandered . . . Houser and . . . [DSU President Richard] Williams when he told a third person, loudly in a public place in the presence of students and staff, that Houser and . . . Williams were 'corrupt' and had 'conspired together against . . . Davenport' by sending 'secret correspondence' to have . . . Davenport terminated so that Houser could get tenure and promotion."

3

*Id.* Defendant Michael Lacourse, DSU's Provost and Vice President of Academic Affairs, signed the letter and copied Defendants Williams and Doajo Hicks, DSU's General Counsel.

Peterson requested a hearing in front of the Faculty Review Board ("FRB") to review his termination. The FRB ultimately determined that DSU failed to support its accusations against Peterson by a preponderance of the evidence and recommended reinstatement of Peterson. It also "concluded that Peterson should be warned not to engage in 'unbecoming comments about the university or its administration.'" *Id.* at 11.

Dr. Elizabeth Hitch, the Associate Commissioner for Academic and Student Affairs for the Utah System of Higher Education, reviewed the FRB's decision. Dr. Hitch "concluded that there was a preponderance of evidence as to several charges against Peterson, but that the condition of 'preponderance of information' to support the termination of . . . Peterson [wa]s not satisfied." *Id.* at 12. Thus, Dr. Hitch determined Peterson should be reinstated following a ten-day suspension. She also required DSU to "issue a 'final chance' letter outlining the expectations of [Peterson's] employment and consequences of similar policy violations in the future." *Id..* She further determined Peterson should "not make unfounded derogatory statements about [DSU] and its faculty, staff, students, or administration" and to "not discuss faculty matters with students and third parties." *Id.*

Following Dr. Hitch's review, Hicks presented Peterson with the "Last Chance Agreement." In addition to prohibiting Peterson from, among other things, making baseless derogatory statements about DSU, it also allegedly altered and amended Peterson's tenure agreement with DSU, exceeding the scope of the final chance letter required by Dr. Hitch.

Hicks told Peterson he had to sign the Last Change Agreement or he would be fired. Peterson refused and unsuccessfully sought intervention by Dr. Hitch. In August 2018, Peterson learned he had been terminated after he was notified his son was no longer eligible for a tuition waiver as a faculty member's child.

**b.**

On August 19, 2019, Peterson sued DSU, Williams, Hicks, Lacourse, and Lynn Joseph, DSU's investigator, and alleged five causes of action. Peterson asserted three causes of action pursuant to 42 U.S.C. § 1983: (1) a First Amendment retaliation claim, (2) a First Amendment prior restraint claim, and (3) a civil conspiracy claim. He also asserted two state-law causes of action—one for breach of contract and one for wrongful termination in violation of public policy. The defendants moved to dismiss Peterson's complaint. The district court granted the defendants' motion, finding Peterson failed to state a claim for any of his three federal claims and dismissing those claims with prejudice. The district court further declined to exercise supplemental jurisdiction over Peterson's state-law claims and dismissed those claims without prejudice. Peterson timely appealed the district court's order as it related to his federal causes of action.

**II.**

We review a district court's order granting a motion to dismiss de novo. *See Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019). Although Federal Rule of Civil Procedure 8 does not require detailed factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,557 (2007)).

Instead, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). To be facially plausible, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although the plausibility standard does not amount to a probability requirement, it does "ask[] for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint pleading "facts that are merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted). Thus, "to enter the realm of plausible liability" and survive a motion to dismiss, a complaint must cross both "the line between the conclusory and the factual" and the line "between the factually neutral and the factually suggestive." *Twombly*, 550 U.S. at 557 n.5.

6

## III.

Applying the motion to dismiss standard, we find Peterson failed to plausibly allege his three federal causes of action.

### a.

Peterson claims that DSU and several of its employees retaliated against him in violation of the First Amendment right to free speech by terminating his employment after he criticized both Houser, whom he viewed as an incompetent departmental leader, and the DSU administration's decision to terminate Davenport. The district court dismissed this claim, holding that Peterson made the statements at issue in the course of his official duties and that they did not reflect a matter of public concern. *See* App'x at 132.

Peterson, by virtue of his job as a professor at a public university, is a public employee. *See, for example*, *Singh v. Cordle*, 936 F.3d 1022, 1029 (10th Cir. 2019). Although a government employer has an "interest in controlling the operation of its workplaces," *Lane v. Franks*, 573 U.S. 228, 236 (2014), the First Amendment nonetheless "protects a public employee's right . . . to speak as a citizen addressing matters of public concern." *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018). In striking a balance between the government's interest in providing effective public services and a citizen's interest in commenting on matters of public concern, "the First Amendment prohibits public employers from taking adverse action against employees because of their protected speech." *Id.* at 945. In other words, a public employee's speech is protected by the First Amendment when he speaks as a citizen

on a matter of public concern. *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006);

*see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

This court has held that the *Garcetti/Pickering* test governs whether an adverse

employment action amounts to impermissible retaliation. *See Trant v. Okla.*, 754

F.3d 1158, 1165 (10th Cir. 2014). The test consists of the following elements:

(1) whether the speech was made pursuant to an employee's official duties;
(2) whether the speech was on a matter of public concern;
(3) whether the government's interest, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests;
(4) whether the protected speech was a motivating factor in the adverse employment action; and
(5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Knopf*, 884 F.3d 945. To prevail on a First Amendment retaliation claim, a plaintiff

must establish that all five elements favor him. *See id.* Ultimately, the employee

must prove that he speaks as a citizen on a matter of public concern, that his interest

in doing so outweighs that of his employer, and that his speech was a substantial

factor in the detrimental employment decision, which the employer would not have

taken in the absence of the protected speech. *See Brammer-Hoelter v. Twin Peaks*

*Charter Acad.*, 492 F.3d 1192, 1202–03 (10th Cir. 2007) (*Brammer-Hoetler I*).

According to the district court, Peterson failed to plausibly plead that he spoke as a

citizen "on a matter of public concern." *Id.* We agree.

According to the Supreme Court, speech is said to involve a matter of public

concern when it relates "to any matter of political, social, or other concern to the

community, or when it is a subject of legitimate news interest; that is, a subject of

general interest and of value and concern to the public." *Lane*, 573 U.S. at 241 (internal quotation marks omitted). Thus, "[s]tatements revealing official impropriety usually involve matters of public concern." *Brammer-Hoelter*, 492 F.3d at 1205. In *Lane*, for instance, the Supreme Court found the plaintiff satisfied the second *Garcetti*/*Pickering* factor when he testified, under oath and during a judicial proceeding, about "corruption in a public program and misuse of state funds." *Lane*, 573 U.S. at 241.

On the other hand, "speech that simply airs grievances of a purely personal nature typically does not involve matters of public concern." *Brammer-Hoelter I*, 492 F.3d at 1205 (internal quotation marks omitted). Accordingly, this court has found that statements "regarding grievances about internal departmental affairs, disputes over the term of employment, and workplace frustration" were "not [on] matters of public concern." *Id.* (internal quotation marks omitted).

Importantly, "[w]hether an employee's speech addresses a matter of public concern" is a question of law that must be determined not only by "the content . . . of a given statement" but also by its "form and context . . . as revealed by the whole record." *Singh*, 936 F.3d at 1034–35 (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)); *see also Lane*, 573 U.S. at 241 (extending its analysis beyond the Court's finding that "[t]he content of [the plaintiff's] testimony . . . obviously involve[d] a matter of significant public concern" to the "form and context" of plaintiff's speech). We thus consider not only *what* was said, but also *why* and *how* it was said. *See Brammer-Hoelter I*, 492 F.3d at 1205.

9

We therefore "consider . . . whether the speech [wa]s calculated to disclose misconduct" rather than to voice "personal disputes and grievances," as well as the motive of the speaker. *Singh*, 936 F.3d at 1035 (internal quotation marks omitted). It is not enough that the speech touched upon a subject of public interest. *See id.* at 1035–36; *see also Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010) ("*Brammer-Hoelter II*"). Nor is it "enough . . . that the public interest was part of the employee's motivation." *Singh*, 936 F.3d at 1035. Rather, our caselaw requires that "the employee's *primary* purpose was to raise a matter of public concern" for the employee to satisfy the *Garcetti*/*Pickering* public concern factor. *Id.*

In our view, Peterson failed to plausibly allege that his purported statements dealt with matters of public concern. First, Peterson failed to allege any actual speech for us to determine whether his speech "addresse[d] a matter of public concern" in light of "the content, form, and context of [Peterson's] statement[s]." *Id.* at 1034–35 (quoting *Connick*, 461 U.S. at 147). Instead, Peterson broadly alleged that he "questioned the correctness of Davenport's termination," "whether . . . Houser . . . was competent in his leadership," and "whether the administration had acted in accordance with due process and good faith in its termination of Davenport" through discussions with community members. App'x at 9. Peterson elsewhere alleged that he "express[ed] criticisms of the competence of Houser . . . and the justness of [the] [d]efendants' actions in the termination of Davenport." *Id.* at 15.

10

Without "further factual enhancement," we have no way of evaluating the "form and context" of Peterson's speech—two of the three factors this court must consider. *See Singh*, 936 F.3d at 1034–35. Based on the complaint, all we know is that Peterson generally made statements critical of Houser's leadership and Davenport's termination to members of his community "through in-person conversations." App'x at 8. But we do not know whether Peterson's statements were "calculated to disclose misconduct" rather than to voice "personal disputes and grievances" such as his disagreement with Davenport's termination. *Singh*, 936 F.3d at 1035 (citation and internal quotation marks omitted). We do not know to whom Peterson spoke, how he said what he purported to say, or how his statements arose.

We do not even know what primarily motivated Peterson. *See id.* The only indication we have of any purpose behind his statements is that he "voiced [his] criticisms and concerns as a concerned member of the Southern Utah community, alarmed at the potential that a state entity . . . may have been failing [his] community." App'x at 9. But this allegation, taken in context, is meant to reinforce Peterson's argument that he spoke as a private citizen, not a public employee, rather than to shed light on his motivation for speaking at all. *See id.* Furthermore, it may be *possible* that Peterson's allegation that the university was "failing [his] community" amounted to a public concern or matter of general interest. But that conclusory statement, standing alone and lacking any specific factual allegations to support its newsworthiness, fails to meet the plausibility standard that is required. *See Iqbal*, 556 U.S. at 678. Finally, because Peterson fails to show that he intended

11

to raise a matter of public concern, he also, of course, fails to prove that this was his "*primary* purpose." *Singh*, 936 F.3d at 1035.

Moreover, because the complaint lacks specific statements by Peterson, there is no way to evaluate the content of Peterson's speech. In his complaint, Peterson alleges that he "questioned the correctness of Davenport's termination, whether Mark Houser was competent in his leadership, and whether the administration had acted in accordance with due process and good faith in its termination of Davenport." App'x at 42 (cleaned up).

Although "speech related to internal personnel disputes ordinarily do[es] not involve public concern," *Dill v. City of Edmond*, 155 F.3d 1193, 1202 (10th Cir. 1998), it is possible to imagine a situation where Peterson's statements about the "correctness" and "justness" of Davenport's termination divulged a matter beyond a personal grievance. App'x at 9, 15; *see Dill*, 155 F.3d at 1202 (holding that speech disclosing "any evidence of corruption, impropriety, or other malfeasance on the part of [public] officials . . . clearly concerns matters of public import"). But, because the complaint contains broad allegations of the subject matter of Peterson's statements rather than the specific purported statements themselves, we have no way of "reasonabl[y] infer[ring]" that the content addressed matters of public concern. *Iqbal*, 556 U.S. at 678. Peterson's allegations lack any indication that his statements dealt with a matter of general interest; they only tell us, in general terms, what his personal interest was in the matter.

12

We acknowledge that "the pleading standard Rule 8 announces does not require 'detailed factual allegations.'" *Id.* (citation omitted). Peterson's bare allegations, however, are devoid of sufficient "factual content [to] allow [us] to draw the reasonable inference that the defendant[s] [are] liable for" First Amendment retaliation. *Id.* As a result, we find the district court was correct to dismiss Peterson's first cause of action for failure to state a claim.

**b.**

For this court "to exercise jurisdiction under Article III" over a claim, a plaintiff "must allege (and ultimately prove) that [he] has suffered an injury in fact, that the injury is fairly traceable to the challenged action of the [d]efendants, and that it is redressable by a favorable decision." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (internal quotation marks omitted). The injury-in-fact question is "particularly delicate" for prior restraint claims. *Id.* at 1088. Unlike a retaliation claim, in which a plaintiff alleges "adverse action taken in response to actual speech," a prior restraint claim is "based on a restriction that chills potential speech before it happens." *Brammer-Hoelter II*, 602 F.3d at 1182 (citation and internal quotation marks omitted). Indeed, the speech "might never occur" and "the government [entity] may have taken no enforcement action." *Walker*, 450 F.3d at 1088.

As a result, this court requires a plaintiff to allege and later prove more than "that the restraint has a subjective chilling effect on his speech" to "satisfy the injury-in-fact requirement." *Brammer-Hoelter II*, 602 F.3d at 1182. Instead, this court has

13

explained that "a chilling effect on the exercise of a plaintiff's First Amendment rights may amount to a judicially cognizable injury in fact, as long as it 'arise[s] from an objectively justified fear of real consequences.'" *Id.* (quoting *Walker*, 450 F.3d at 1088). Additionally, the plaintiff must also allege that his speech was actually chilled. *See id.* at 1183–84 (concluding that the plaintiffs did not have standing for one of their prior restraint claims because "nothing in the record indicat[ed] their speech . . . was altered or deterred in any way" by the alleged restraint nor "support[ed] the conclusion [that the restraint] caused [the] [p]laintiffs a concrete, judicially cognizable injury").

Peterson fails to allege that the Last Chance Agreement "altered or deterred" his speech. *Id.* Peterson only alleges that he tried to challenge the Last Chance Agreement, refused to sign it, and learned at the start of the next school year he had been terminated. There is no indication, however, that the agreement caused him to alter his speech. Therefore, we find the district court was correct to dismiss this claim.

The district court dismissed this claim with prejudice. Because we find that Peterson failed to plausibly allege a standing issue, we remand to the district court to amend the judgment to dismiss this claim without prejudice. *See Bruzga v. City of Boulder*, 795 F. App'x 599, 604–05 (10th Cir. 2020) (holding that "because the dismissal was for lack of standing it should have been without prejudice" and remanding matter to district court to modify judgment).

**c.**

14

Peterson's final federal claim—his civil conspiracy claim—is derivative of his two constitutional claims. Because he failed to plausibly allege either of those two claims, however, Peterson necessarily failed to plausibly allege this claim as well. In any event, Peterson failed to plausibly allege there was a conspiracy at all. Peterson relies on his allegations that the defendants knew about Peterson's criticisms and that Williams and Hicks were copied on the termination letter signed by Lacourse. Peterson further relies on his speculation that Hicks drafted the Last Chance Agreement "at the direction of Williams and Lacourse." App'x at 13. But these allegations, taken as true, do not support a "reasonable inference" that the defendants agreed to deprive Peterson of his constitutional rights. *See Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998) (finding it unreasonable to infer that defendants conspired together because they met with one another before a meeting that ended unfavorably for the plaintiff). Rather, these allegations merely show that the DSU president, provost and vice president, and general counsel had overlapping roles in and were kept informed of the initial termination and subsequent disciplining of Peterson. To be sure, these allegations may be "consistent with" an agreement, but "mere[] consisten[cy]" is insufficient to cross "the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). Moreover, to the extent Peterson suggests we should glean an "agreement" from his speculation that Williams and Lacourse "directed" the DSU general counsel to draft the Last Chance Agreement, that allegation, without more, is simply a "naked assertion devoid of further factual enhancement." *Id.* Neither "factually neutral" nor

15

"conclusory" allegations, however, are enough to survive a motion to dismiss. *Twombly*, 550 U.S. at 557 n.5.  Therefore, we affirm the district court's dismissal of this claim as well.

<h2 style="text-align:center">IV.</h2>

For the foregoing reasons, we affirm.  Because we find Peterson failed to plausibly allege standing for his prior restraint claim, we remand to the district court to amend its judgment to dismiss this claim without prejudice.

Entered for the Court


Allison H. Eid
Circuit Judge